478 A.2d 1143

**James Russell TRIMBLE**

v.

**STATE of Maryland.**

**Nos. 15, 98, Sept. Term, 1982.**

Court of Appeals of Maryland.

Aug. 17, 1984.

388

390

392

Gary W. Christopher and George E. Burns, Jr., Asst. Public Defenders, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Stephanie J. Lane, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen. and Deborah K. Handel, Asst. Atty. Gen., Baltimore, on brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

COLE, Judge.

On March 12, 1982, after a jury trial in the Circuit Court for Baltimore County, James Russell Trimble was found guilty of first-degree murder, first-degree rape, two counts of first-degree sexual offense, two counts of kidnapping, and one count of assault. His only defense was insanity. After the jury verdict, Trimble elected to be sentenced by the court. On March 19, 1982, the Court sentenced Trimble to death on the murder count and imposed three life terms plus seventy years on the remaining counts. The entire case is before us pursuant to the automatic-review provision in Maryland Code Art. 27, § 414(a). We affirm.

The facts adduced at trial were as follows: On July 3, 1981, Melanie Rae Newsom and the murder victim, Nila Kay Rogers, went to a local tavern. In the tavern parking lot, Rogers met a school friend, James Hanna, who invited them to ride around in a van with him and some of his friends. The three of them entered a van containing Trimble, Terry and Joseph Evans, and Anthony Kordell. Previously, the Evans brothers and Kordell had taken PCP, marijuana, and beer, and Trimble had taken valium and beer.

Shortly after the women entered the van, Trimble tried to kiss Newsom, and when she resisted he screamed and began tearing off her clothing. Rogers attempted to intercede, but Trimble punched her and threw her into the back of the van; he then bit Newsom severely, and forced her to commit fellatio. After another futile attempt by Rogers to stop the assault on Newsom, the two women persuaded the men to stop the van, and Hanna took Newsom out into a cornfield, where he tried unsuccessfully to have intercourse with her. Meanwhile, Trimble and Joseph Evans raped Rogers; Kordell then tried to pull Rogers out of the van, and, as he did so, Trimble struck her on the head with a baseball bat. Kordell unsuccessfully tried to take the bat from Trimble, then retreated to the other side of the van while Trimble repeatedly struck Rogers with the bat. Trim-

ble then dragged Rogers into the cornfield and slit her throat.

After disposing of Rogers' body, Trimble returned to the van. He and the others could not locate Hanna and Newsom, who were still in the cornfield, so they got into the van and left. Hanna and Newsom saw the van leave, and she persuaded him to accompany her to the side of the road. She then flagged down a passing motorcyclist, who took her to a nearby house where she called the police. Baltimore County police officers responded to the call and thereafter discovered the body of Rogers; she was pronounced dead at the scene at 6:30 a.m. on July 4, 1981. The cause of death was listed as severe head injuries from a blunt object.

Trimble's only defense was insanity. The trial court, after hearing testimony from Trimble's expert witness, determined that Trimble had generated an insanity issue.[1] The State produced Dr. Michael Spodak, who testified "to a reasonable degree of medical probability" that Trimble suffered from antisocial personality and mixed substance abuse by history, but that despite these disorders Trimble was not insane because he did not lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.[2] Dr.

---

1. The trial court was following the insanity-defense procedures established by this Court in *Bradford v. State,* 234 Md. 505, 200 A.2d 150 (1964): First, a preliminary determination was made, out of the jury's presence, as to whether the defendant's evidence could satisfy the burden of production as to insanity. Once the court found that the evidence could generate a jury issue, the evidence was submitted to the jury with the State first introducing its evidence as to the commission of the crime, followed by evidence of the defendant's sanity; the defendant then was allowed to produce evidence of insanity. *See also Fowler v. State,* 237 Md. 508, 206 A.2d 802 (1965); *Strawderman v. State,* 4 Md.App. 689, 244 A.2d 888 (1968).

2. This is the standard for insanity under Maryland Code (1984) § 12–107 of the Health-General Article. This section states in full:
 A defendant is not responsible for criminal conduct if, at the time of that conduct, the defendant, because of mental retardation or a mental disorder, lacks substantial capacity:
 (1) To appreciate the criminality of that conduct; or
 (2) To conform that conduct to the requirements of law.

Spodak further testified that Trimble had a below-normal, full-scale I.Q. of 64, but that this factor did not impair his sanity. The State then called Dr. Neil Blumberg, who testified that Trimble suffered from antisocial personality disorder and mixed substance abuse, but that these disorders did not render Trimble unable either to appreciate the criminality of his conduct or to conform his conduct to the law. This testimony was also based on "reasonable medical probability." Dr. Blumberg further stated that Trimble may have been faking his symptoms. He did not testify as to Trimble's I.Q. Dr. Robert Lehman then testified as the sole defense witness. Dr. Lehman testified to a reasonable degree of medical certainty that Trimble was suffering from antisocial personality, periodic organic psychosis, and mental retardation. However, he testified only to a "reasonable possibility" that these disorders caused him to lack substantial capacity to conform his conduct to the law. He declined to state this conclusion with reasonable medical certainty or probability.

Based on this evidence, the jury returned guilty verdicts on all seven counts of the indictment, rejecting Trimble's affirmative defense of insanity. After waiving his right to be sentenced by the jury, Trimble was sentenced to death by the trial judge. On this appeal, Trimble raises several contentions of error arising out of the guilt stage as well as the sentencing stage of the trial. We shall address each of his contentions in turn.

I

Trimble's first contention of error focuses on the trial court's instructions to the jury on insanity. The court instructed the jury, in pertinent part, as follows:

Ladies and gentlemen, I will read to you the legal definition of insanity as used in criminal cases in Maryland, and this you are responsible for and bound by. This

is the definition of insanity that is your responsibility to apply in this case. A defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if, at the time of such conduct, as a result of mental disorder, he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

\* \* \* \* \* \*

Therefore, the first determination which has to be made is whether the defendant at the time of the acts charged against him was or was not afflicted by a mental disorder. Mental disorder as defined by law means mental illness or any other form of behavioral or emotional illness resulting from any psychiatric or neurological disorder. *The term shall not include mental retardation.* [Emphasis supplied.]

Trimble argues that this instruction was not a complete and accurate statement of the law. He bases his argument on § 12–107 of the Health-General Article, which provides:

§ 12–107. Insanity—Test of responsibility for criminal conduct.

A defendant is not responsible for criminal conduct if, at the time of that conduct, the defendant, *because of mental retardation or a mental disorder,* lacks substantial capacity:

(1) To appreciate the criminality of that conduct; or

(1) To conform that conduct to the requirements of law. (Emphasis supplied).

Trimble maintains that the court's instruction excluded any consideration of mental retardation by the jury as a basis for a finding of insanity. Trimble is correct. Trimble, however, did not object to the court's instruction. Nonetheless, he persists we should recognize the court's failure properly to instruct the jury as plain error under Maryland Rule 757h.

Rule 757h provides that an appellate court may, in its discretion, "take cognizance of and correct any plain error in the instructions, material to the rights of the defendant even though the error was not objected to as provided by Rule 757f." [3] Trimble maintains that the circumstances of this case justify our exercising such discretion. We disagree and shall decline his invitation.

We said in *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035, 1038 (1980), that "we have characterized instances when an appellate court should take cognizance of unobjected to error as compelling, extraordinary, exceptional or fundamental to assure the defendant of fair trial." We further made clear that we would intervene in those circumstances only when the error complained of was so material to the rights of the accused as to amount to the kind of prejudice which precluded an impartial trial. *Id.* Thus, we shall examine the circumstances at the time of the court's instructions to determine if the court's omission was prejudicial.

As we have already noted, § 12–107 plainly includes both mental disorders and mental retardation as potential causes of legal insanity. Section 12–101(f)(3) states that "mental disorder" does not include "mental retardation" and the trial court's instruction so stated. The instruction did not, however, advise the jury that either affliction could cause a defendant to be found legally insane [4] if either substantially limited the capacity of the defendant to appreciate the

---

**3.** Rule 757 f provides:

> If a party has an objection to any instructions, to any omission therefrom, or to the failure to give an instruction he shall make the objection on the record before the jury retires to consider its verdict and shall state distinctly the matter or omission, or failure to instruct to which he objects and the grounds of his objection. Upon request of any party, the court shall receive objections out of the hearing of the jury.

**4.** Mental retardation was included as a possible cause of insanity in 1982. *See* 1982 Md.Laws ch. 21.

criminality of his conduct or to conform that conduct to the requirements of law.

The question we must answer, then, is whether there was evidence adduced during the course of the trial which generated a jury issue as to whether the defendant's mental retardation caused him to be legally insane. Dr. Spodak testified that Trimble had a full-scale I.Q. of 64, placing him in the borderline or mild range of mental retardation. Dr. Lehman made a passing reference that Trimble had a below-normal I.Q. of 64. Dr. Lehman did not state that this condition caused Trimble to lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the law. As a matter of fact, Dr. Lehman virtually excluded mental retardation from his analysis of Trimble's responsibility under § 12–107. Dr. Lehman stated:

In my review with Mr. Trimble he complained [of] no difficulty in appreciating the fact that what he was doing was wrong. He knew that. He claims, though, he was hallucinating that night and saw gorillas that night. When he was swinging the bat at the girl he saw the face of a girl he was swinging the bat at. He knew it was wrong. He said he could not stop himself, which would be a part of the second, that is, he was saying he—not in these words—he lacked the capacity to conform his conduct to the law. Antisocial personalities chronically have that problem. They have difficulty conforming their conduct to the law, though they know what the law is. Although he suffers from mental retardation, he did know what he was doing was wrong.

Dr. Lehman at no time characterized Trimble's retardation as contributing to his misconduct. Both Drs. Spodak and Blumberg found Trimble's mild or moderate mental retardation insignificant. Dr. Lehman found that despite his mental retardation Trimble knew what he was doing was wrong and that his failure to conform was caused by his antisocial personality. There simply was no evidence that linked Trimble's misconduct to his mental retardation.

To the contrary, the evidence indicated that Trimble was able to hold down a job and perform other normal social chores without any substantial handicap. His antisocial personality, intensified by his drug and alcohol abuse, was the reason he could not conform.

■ As we see it, the question of Trimble's mental retardation was not material to his defense and the trial court's failure to include mental retardation as a basis for the jury's deciding if Trimble was insane at the time of the crimes under consideration did not deprive him of a fair trial. The omission in the instruction was not preserved for review and was not plain error.

## II

Trimble's second contention of trial error is also based on the expert testimony on the insanity issue. After Dr. Blumberg testified for the State that Trimble was not insane and may have been faking his symptoms, he was cross-examined about Trimble's stay at Clifton T. Perkins Hospital. Dr. Blumberg acknowledged that Trimble had been given Thorazine, an antipsychotic drug and a major tranquilizer. The following exchange then took place:

Q. [DEFENSE COUNSEL]: Do you approve of this treatment of Thorazine and Artane?

A. In Mr. Trimble?

Q. Yes.

A. No.

Q. You do not?

A. No.

Q. Why don't you?

A. I don't because I believe the symptoms that he is manifesting at the present time are not the result of a psychosis. They are the result of his feigning behavior that is geared to look like he is psychotic. I don't believe he is suffering from the type of mental illness which would warrant such treatment.

Q. Who did believe he was psychotic?

[STATE'S ATTORNEY]: Objection.

THE COURT: If you know, sir, who prescribed it?

A. I can look at the order if you would like me to.

Q. Yes, I would like you to look at it.

A. His medication for Thorazine is signed by Dr. Freinek. I would want to add—

Q. I want to know who prescribed it? Dr. Freinek?

A. That is correct.

Q. How do you spell that?

A. F-r—and your guess is as good as mine—I know him but I am not sure whether it is e-i or i-e-n—

Q. What is his position with the hospital?

A. He is a psychiatrist on the staff of the hospital.

Q. Did he make an evaluation of this patient?

A. When Mr. Trimble was admitted, he was the ward psychiatrist on ward three, which is the admission ward.

The import of this exchange is that defense counsel was attempting to show that Dr. Freinek prescribed an antipsychotic drug for Trimble because Trimble was insane.

On redirect, the State returned to this subject:

Q. [STATE'S ATTORNEY]: Dr. Blumberg, just a couple of questions. Did Dr. Freinek participate in the staff conference and evaluation of this defendant in November?

A. No, he did not.

Q. To the best of your knowledge, did Dr. Freinek evaluate the defendant for responsibility at the time of the offense?

A. No, he did not.

Q. And the prescription for the defendant for Thorazine, would that come from symptoms observed by members of the staff at Clifton T. Perkins?

A. Very possibly. Knowing Dr. Freinek and some of his prescribing policies on ward three—

[DEFENSE COUNSEL]: I object as to what Dr. Freinek's prescription policies are.

[STATE'S ATTORNEY]: He got into it.

THE COURT: Overruled. The doctor indicates that he is familiar with them.

Q. You may continue.

A. When an individual comes onto the ward and acts in a very agitated manner evidencing bizarre behavior, regardless of its cause Dr. Freinek seems a lot more likely than most of the other psychiatrists to prescribe a medication primarily to sedate the individual as opposed to necessary for any psychotic benefit of the drug, and ward three, which is the admission ward, is a very, very difficult place to work on. We have all the individuals who come in for pretrial evaluations who are fresh out of jail and are put in the hospital plus all the patients who are no longer treatable on the less restrictive wards. This is the maximum of the maximum security unit. There is a great deal of disruptive behavior, and he is a lot freer with medication than many of the other staff members, including myself.

The object of this testimony was to negate the inference that Trimble was insane by showing that Dr. Freinek prescribed Thorazine for Trimble only as a sedative. Trimble maintains that the admission of this testimony was reversible error because it was hearsay and because it violated the best-evidence rule. The State contends that this testimony violated neither the best-evidence rule nor the rule against hearsay, and that defense counsel "opened the door" to the admission of this testimony by his question on cross-examination on that very same subject.

█ The examination of witnesses at a trial is left largely to the discretion of the trial judge and no error will be recognized unless there is a clear abuse of that discretion. This Court stated the rule as to the scope of cross-examination observed in this State in *Williams v. Graff*, 194 Md. 516, 522, 71 A.2d 450, 452–53 (1950):

[W]here a witness is called to testify on a particular point, the adverse party in the cross-examination of the witness

is restricted to the point on which he testified and cannot question him in regard to other issues in the case.

\* \* \* \* \* \*

However, our rule does not go to the extent of restricting the cross-examination of the witness to the specific details inquired into on direct examination, but permits full inquiry into the subject matter entered into. Where a general subject has been entered upon in the examination in chief, the cross-examining counsel may ask any relevant question on the general subject.

As to the scope of redirect examination, this Court said in *Fisher Body Division v. Alston,* 252 Md. 51, 56, 249 A.2d 130, 133 (1969):

As a general rule, redirect examination must be confined to matters brought out on cross-examination. However, it is within the court's discretion to allow the introduction of something new or forgotten if the purposes of justice seem to demand it, and this Court will not interfere unless there is a clear abuse of such discretion.

Here, the State sought to establish by its direct examination of Dr. Blumberg that Trimble was not psychotic but rather was faking the symptoms of an insane person. On cross-examination, defense counsel sought to rebut this testimony by creating an inference that Trimble was insane because Dr. Freinek prescribed Thorazine as an antipsychotic drug. On redirect examination, the State proceeded to dispel this inference by demonstrating the usual practice of Dr. Freinek in prescribing Thorazine as a tranquilizer for patients in the admissions ward.

■ Trimble objects to the State's inquiry on redirect because he claims it is tantamount to having Dr. Blumberg testify as to Dr. Freinek's opinion as to whether Trimble was psychotic. As we see it, Trimble's objection seeks to cloud the issue. What Trimble conveniently overlooks is that he opened the door to such testimony by eliciting from Dr. Blumberg the inference that Dr. Freinek had prescribed Thorazine for Trimble because Trimble was psychotic. On

direct examination, Dr. Blumberg limited his testimony to his conclusions based on his own examination of Trimble. Then, on cross-examination, defense counsel expanded the scope of Dr. Blumberg's testimony to include Dr. Freinek's action. The State on redirect examination then sought to disprove the inference that Trimble was psychotic. Because the State established that Dr. Blumberg was familiar with Dr. Freinek's prescription policies, it had a sound basis for explaining the inference to be drawn from the fact of Dr. Freinek's prescribing Thorazine for Trimble. Defense counsel, having created the issue, cannot now be heard to complain that the State sought to rebut its significance. We find no error on this point.

 Trimble's argument on the best-evidence rule misconceives its applicability. Generally, the rule applies to require a party to produce the original of a document instead of a duplicate or copy. *Gray v. State,* 181 Md. 439, 30 A.2d 744 (1943). C. McCormick, *McCormick on Evidence* 559–62 (2d Ed.1972). Here, Trimble maintains that Dr. Blumberg's testimony about Dr. Freinek's prescription policies is not admissible because Dr. Freinek's own testimony as to his policies is the best evidence. Obviously, Dr. Freinek's testimony would not be documentary evidence, so the purposes of the best-evidence rule—to ensure that the exact terminology of a writing is presented to the court and to guard against fraud—are inapplicable. *See Gray,* 181 Md. at 443, 30 A.2d at 746; *McCormick* at 561–62. We conclude that the trial court did not violate the best-evidence rule by admitting Dr. Blumberg's testimony.

### III

Trimble next contends that the trial court erred in permitting the State's Attorney to make the following remark during his closing argument:

[W]hom did the defense put on to testify that this defendant was in fact insane at the time of the offense? I submit to you nobody. Nobody testified he was insane at

the time of the offense. Dr. Lehman testified and Dr. Lehman has no formal training in forensic psychiatry. He has a practice limited to child and adolescent psychiatry. He is not affiliated with any State or mental hospital, and he has in the past only examined five defendants to determine their responsibility at the time of a given offense. He, unlike Dr. Spodak and Dr. Blumberg, is eminently unqualified to give an opinion seven months after the occurrence of an offense as to what the defendant's mental state was at the time of the offense.

According to Trimble's argument, the State's Attorney's statements went beyond the permissible bounds of closing argument because the trial court had previously qualified Dr. Lehman as an expert. We disagree.

■ Trimble correctly asserts that questions of the qualifications of expert witnesses are for the court to decide as a preliminary matter of law. But this does not mean that the expert's qualifications may not be minimized when arguing that the expert's opinion should not be accepted. The court's threshold determination simply represents a finding that the expert has the minimum degree of expertise necessary to allow him to state an opinion as to a given set of facts; it does not mean that the jury is bound to believe all or any part of his testimony. Rather, the quality, bias, strength, basis, and sincerity of an expert opinion can still be attacked before the jury as a matter of credibility.

Thus, the issue here is whether the State's Attorney's statement to the jury constituted error because he characterized Dr. Lehman as "unqualified." Looking at the prosecutor's statement as a whole, his remarks questioned the believability of Dr. Lehman's testimony: He noted that Dr. Lehman was not trained in forensic psychiatry, that he had no affiliation with a mental hospital, that he had little experience in the area of criminal responsibility, and that he only diagnosed Trimble seven months after the event. These remarks all pertain to Dr. Lehman's credibility as an expert witness, a subject well within the range of permissi-

ble argument to the jury. In short, the State's Attorney was urging the jury to disbelieve Dr. Lehman's testimony.

We do not believe that these remarks become prejudicial simply because the State's Attorney used the word "unqualified." The obvious import of this adjective was to question the credibility of the expert witness. Even though Dr. Lehman met the minimum requirements of expertise needed to give an expert opinion, the jury was still free to disregard his testimony and believe the "more qualified" expert. Subject to the trial court's discretion, both the State's Attorney and defense counsel are given wide latitude in the conduct of closing argument, including the right to explain or to attack all the evidence in the case. *Poole v. State*, 295 Md. 167, 191–93, 453 A.2d 1218, 1231–32 (1983); *Wilhelm v. State*, 272 Md. 404, 412–13, 326 A.2d 707, 714 (1974). We see no abuse of discretion here.

### IV

Trimble makes several arguments concerning the sentencing stage of the trial conducted pursuant to Md.Code Art. 27, § 413. The first of these contentions is that the trial court erroneously found as an aggravating circumstance under § 413(d)(4)[5] that "[t]he victim was a hostage

---

5. Section 413(d) provides in full:

 (d) Consideration of aggravating circumstances.—In determining the sentence, the court or jury, as the case may be, shall first consider whether, beyond a reasonable doubt, any of the following aggravating circumstances exist:

 (1) The victim was a law enforcement officer who was murdered while in the performance of his duties.

 (2) The defendant committed the murder at a time when he was confined in any correctional institution.

 (3) The defendant committed the murder in furtherance of an escape or an attempt to escape from or evade the lawful custody, arrest, or detention of or by an officer or guard of a correctional institution or by a law enforcement officer.

 (4) The victim was a hostage taken or attempted to be taken in the course of a kidnapping or abduction or an attempt to kidnap or abduct.

taken or attempted to be taken in the course of a kidnapping or abduction or an attempt to kidnap or abduct." Trimble claims that "hostage" should be narrowly defined to mean a person who is held to enforce demands upon a third person. The State, on the other hand, maintains that the term hostage refers more generally to a kidnap victim without regard to whether any demands are made on third persons.

Our task, therefore, is to ascertain the meaning of the term hostage as used by the legislature in the context of § 413. Looking first to the face of the statute, subsection (d)(4) is worded in terms of the characteristics of the victim—he or she must be a "hostage ... taken in the course of a kidnapping or abduction...." This structure seems to support a broader, more generic definition of hostage, because the term is being used to describe a person who is the victim of a kidnapping or an abduction. Yet this structure alone does not suffice to answer Trimble's contention, because the wording would also support a more narrow reading which encompasses kidnap victims only if they are held hostage to enforce demands on a third person. Thus, it is possible that the legislature intended to include as an aggravating circumstance only a small subclass of kidnappings—those in which the defendant takes his victim to enforce demands on others.

---

(5) The victim was a child abducted in violation of § 2 of this article.

(6) The defendant committed the murder pursuant to an agreement or contract for remuneration or the promise of remuneration to commit the murder.

(7) The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration.

(8) At the time of the murder, the defendant was under sentence of death or imprisonment for life.

(9) The defendant committed more than one offense of murder in the first degree arising out of the same incident.

(10) The defendant committed the murder while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree.

The legislative history surrounding the enactment of § 413, however, indicates that the legislature did not intend to single out certain kidnappings as aggravating circumstances, but intended to include all kidnappings. Senate Bill 374, which became law in 1978 as the current § 413, *see* 1978 Md.Laws ch. 3, was a proposal originating from the Governor's Legislative Office. The language contained in § 413(d)(4)—"[t]he victim was a hostage taken or attempted to be taken in the course of a kidnapping..."—is identical to the language in the original proposal; the legislative records do not disclose any proposals to amend this language or any legislative debate on its meaning.[6]

But the Governor's Chief Legislative Officer, who drafted the bill, submitted to the General Assembly a lengthy memorandum explaining the bill. The memorandum explained subsection (d)(4) as follows:

> Paragraph (4) relates to the murder of a kidnap victim. The draft adds to this paragraph, as an aggravating factor to be considered, the murder of a person abducted. At common law, the difference between these offenses was that, while a kidnapping involved the taking of a person outside the country, an abduction involved a taking of a person for immoral purposes. The purpose of this paragraph, as enacted in 1975, was to deter the kidnapper from murdering his hostage. Absent capital punishment, the penalty for kidnapping (30 years) and for murder (life imprisonment) are no so dissimilar as to deter the kidnapper from killing the only witness to his crime. The differences between 30 years in jail and death is believed to be significant enough to deter the murder of the hostage.[7]

---

6. Section 413(d)(4) was amended by the Acts of 1983 deleting the words "a hostage." The section now reads:

 The victim was taken or attempted to be taken in the course of a kidnapping or abduction or an attempt to kidnap or abduct.

7. Memorandum from Thomas J. Petticord, Jr., Chief Legislative Officer, to General Assembly (December 14, 1977).

This memorandum is significant in a number of respects. First, it states that (d)(4) "relates to the murder of a kidnap victim." Thus, it apparently uses the term hostage only to describe a kidnap victim, not as a limiting term to narrow the class of kidnappings eligible as aggravating circumstances. Second, it states that the purpose of (d)(4) is to deter kidnappers from murdering their victims. Obviously, this purpose is not confined to kidnappings in which the kidnapper uses the victim to make a demand on a third person, but applies equally to all kidnappings. Third, the memorandum makes no mention of creating a subclass of kidnappings. Rather, it speaks in terms of the Maryland version of the·crime of kidnapping, which does not define kidnapping in terms of making demands on third persons.[8] Thus, this memorandum's explanation of the reach of subsection (d)(4), and the General Assembly's adoption of that provision *in toto*, support an inference that the General Assembly did not intend to limit this aggravating circumstance to kidnappings in which the kidnapper makes a demand on a third person.

Trimble cites several cases that have employed a more restrictive definition of the·term hostage, but, upon examination, none is persuasive here. In three of the cases, the applicable kidnapping statutes defined kidnapping as the confinement or asportation of a person with any of four different purposes, one of which is to hold the victim as a

---

**8.** Section 337 provides:
§ 337. Generally.
Every person, his counsellors, aiders or abettors, who shall be convicted of the crime of kidnapping and forcibly or fraudulently carrying or causing to be carried out of or within this State any person, except in the case of a person under eighteen years of age, by a parent thereof, with intent to have such person carried out of or within this State, or with the intent to have such person concealed within the State or without the State, shall be guilty of a felony and shall be sentenced to the penitentiary for not more than thirty years.
See *Johnson v. State*, 292 Md. 405, 439 A.2d 542 (1982); *Midgett v. State*, 216 Md. 26, 139 A.2d 209 (1958).

shield or hostage.[9] In each case, the court held that the term hostage meant a person held to enforce demands on a third person. Each statute, however, listed as another purpose inflicting bodily injury or terrorizing the victim without regard to any demands made on a third person, so a restrictive definition of one purpose did not restrict the overall crime. Here, on the other hand, such a restrictive definition would limit the entire aggravating circumstance to cases where the accused makes a demand on another, because there is no separate provision dealing solely with the accused's treatment of the victim.[10]

■■ Therefore, we decline to define hostage in § 413(d)(4) to mean only a person held to enforce a demand on another person. Such a construction would eliminate as an aggravating circumstance under (d)(4) any kidnapping or abduction, however heinous, if the accused does not make a demand on a third person. We are not persuaded that the legislature intended to eliminate such a large class of kidnappings from the reach of § 413(d) in the absence of an express provision to that effect. Therefore, we hold that the term hostage in § 413(d)(4) refers to the victim of any kidnapping or abduction without regard to whether the kidnapper or abductor makes any demand on a third party.[11]

---

**9.** *State v. Littlefield,* 389 A.2d 16 (Me.1978); *State v. Crump,* 82 N.M. 487, 484 P.2d 329 (1971); *State v. Lee,* 33 N.C.App. 162, 234 S.E.2d 482 (1977). Each of these states has a statute modeled after § 212.1 of the Model Penal Code.

**10.** The other two cases, *State v. Stone,* 122 Ariz. 304, 594 P.2d 558 (Ariz.App.1979), and *People v. Kavinsky,* 98 Ill.App.3d 579, 53 Ill.Dec. 705, 424 N.E.2d 340 (1981), are likewise inapposite because the applicable statute actually defined hostage as someone held to enforce any demands on others.

**11.** We note that this Court came to the same result *sub silentio* in *Johnson v. State,* 292 Md. 405, 437–38 n. 18, 439 A.2d 542, 560 n. 18 (1982).

## V and VI

Trimble's fifth and sixth contentions of error, both concerning the sentencing stage of his trial, question the trial judge's application of § 413. After hearing evidence, the trial court read its findings, in the form of a written report, in open court. The report indicated that the trial judge had found two aggravating circumstances beyond a reasonable doubt: (1) that the victim was a hostage taken in the course of a kidnapping and (2) that Trimble had committed the murder while committing rape and sexual offense in the first degree. The report also indicated that the trial judge found three mitigating circumstances by a preponderance of the evidence: (1) that Trimble had not previously been found guilty of a crime of violence, (2) Trimble's youthful age, and (3) Trimble's antisocial personality and substance abuse by history.

After reading these findings, the judge came to Section III of the report, which calls for the trier of fact to weigh the aggravating circumstances against the mitigating circumstances pursuant to § 413(h).[12] At this point, the judge digressed into a discussion about some of the policies behind the death penalty as expressed by the Supreme Court, other courts, and commentators. He first quoted from a 1930 Pennsylvania case, *Commonwealth v. Ritter*, 13 Pa.D. & C. 285, 291 (1930):

> Only the death penalty gives absolute protection; if the prisoner receives a life sentence "he may again commit murder within the prison walls, or may escape and again

---

12. Section 413(h) provides:

 (h) Weighing mitigating and aggravating circumstances.—(1) If the court or jury finds that one or more of these mitigating circumstances exist, it shall determine whether, by a preponderance of the evidence, the mitigating circumstances outweigh the aggravating circumstances.

 (2) If it finds that the mitigating circumstances do not outweigh the aggravating circumstances, the sentence shall be death.

 (3) If it finds that the mitigating circumstances outweigh the aggravating circumstances, the sentence shall be imprisonment for life.

make innocent victims his prey, or may even, by cunning simulation of repentence, obtain a pardon from governmental authorities."

He then quoted from LaFave & Scott, *Criminal Law* 25 (1972):

The current emphasis upon rehabilitation is reflected in probation and parole, as well as in the modern tendency to treat alcoholics, drug addicts and sexual psychopaths as sick persons, and juvenile delinquents as misguided children.

Next, the trial judge quoted *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2929–30, 49 L.Ed.2d 859, 880–81 (1976):

The death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders.

In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs. The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they "deserve" then there are sown the seeds of anarchy—of self-help vigilante justice, and lynch law.

Retribution is no longer a forbidden objective nor one inconsistent with our respect for the dignity of men. The decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so griev-

ous an affront to humanity that the only adequate response may be the penalty of death.[13]

The judge then recited the details of the rape-murder of Rogers and discussed Trimble's background, including his prior sadistic behavior and other mental problems. The judge then concluded:

> I can only conclude that the crime committed by [James Russell] Trimble was so grievous an affront to humanity, that the only adequate response of this Court is to impose the penalty of death.
>
> I, therefore, answer the question in Part III "no", and complete the form in Section III: If Section III was completed and was marked "no" enter "death".

▆ Trimble contends, on the basis of these passages, that the trial court erred in applying § 413 in two related ways: (1) by impermissibly considering the possibility of parole or probation in determining the proper sentence, and (2) by applying "his own standards" in lieu of the standards set forth in § 413. Upon our review of the proceedings, however, we hold that the trial judge neither considered impermissible factors nor misapplied § 413.

The trial judge mentioned parole or pardon only because the quotation from the Pennsylvania case mentioned it in the context of a discussion of the death penalty as society's "absolute protection." Nothing in the transcript indicates that the trial judge actually considered the possibility of parole or pardon in determining the sentence under § 413.[14] Rather, the trial judge was simply exploring some of the policies behind the death penalty.

Thus, this case does not come within the rule in *Poole v. State*, 295 Md. 167, 453 A.2d 1218 (1983) (*Poole II*). In *Poole II*, the prosecutor argued to the sentencing jury that

---

**13.** None of the following remarks is a verbatim quote from the source used by the trial judge; some language was omitted. The omissions do not, however, take the passages out of context.

**14.** Moreover, the passage only mentions the possibility of a pardon, which can still be obtained even if the trial judge sentences the defendant to death.

the defendant should receive the death penalty because of the possibility that he could be paroled if given a life sentence. The Court held that such comments were improper. *Id.* at 196, 453 A.2d at 1232–33. *See also Poole v. State,* 290 Md. 114, 428 A.2d 434 (1981) *(Poole I)*; *Shoemaker v. State,* 228 Md. 462, 180 A.2d 682 (1962). Here, on the other hand, the sentencing judge made only a cursory mention of pardon in a different context and did not in any way rely on this factor.

■■ Similarly, the trial judge's discussion does not indicate that he applied his own standards instead of applying § 413. The death penalty statute need not be applied in a vacuum; consideration of the legal and philosophical justifications for the death penalty is not inappropriate as long as the statute itself is not disregarded. Here, the trial judge simply recognized some of the basic policies underlying punishment—deterrence, retribution, and rehabilitation— and juxtaposed them with the Maryland death-penalty scheme. Moreover, some of the judge's reference material was drawn from Supreme Court case law, which of course is the very foundation of the Maryland statute. Consideration of these factors is in no way inconsistent with § 413.

A close reading of the transcript of the proceeding indicates that the trial judge carefully considered the details of Trimble's offense and his background in weighing the aggravating factors against the mitigating factors pursuant to § 413. The quotations challenged by Trimble simply punctuated a detailed examination of the facts of the case, facts which plainly support his conclusion. To hold, as Trimble would have us do, that this conclusion should be reversed because the trial judge looked at the larger picture, would only encourage a mechanical application of the death penalty. This we decline to endorse.

## VII

Trimble maintains that the death sentence should be vacated because he had the burden of proving, as a mitigat-

ing circumstance under § 413(g)(4),[15] that the murder was committed while his capacity either to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired by mental incapacity, a mental disorder, an emotional disturbance, or intoxication. According to this argument, the State should shoulder the burden of persuasion as to this mitigating circumstance because, at trial, Trimble successfully satisfied his burden of production on the insanity issue.

As we recognized in *Tichnell v. State*, 287 Md. 695, 415 A.2d 830 (1980) (*Tichnell I*):

Section 413 does not explicitly specify which party has the burden of producing evidence and the burden of persuasion. Instead, § 413 speaks in terms of requiring the sentencing authority to make findings that satisfy either the reasonable doubt or the preponderance of evidence standard; the section involves a three-step procedure. First, as a condition precedent to the imposition of the death penalty, the sentencing authority must find beyond a reasonable doubt that at least one aggravating circumstance has been proved. § 413(f). As to this, the State bears both the risk of nonproduction and nonpersuasion. The second step requires that the sentencing authority consider whether, by a preponderance of the evidence, a mitigating circumstance exists. § 413(g). This provision does not require the prosecution to disprove the existence of mitigation, thus placing on the accused the risk of nonproduction and nonpersuasion.

---

**15.** Section 413(g)(4) provides:

(g) Consideration of mitigating circumstances.—If the court or jury finds, beyond a reasonable doubt, that one or more of these aggravating circumstances exist, it shall then consider whether, based upon a preponderance of the evidence, any of the following mitigating circumstances exist:

\* \* \* \* \* \*

(4) The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity.

*Id.* at 730, 415 A.2d at 849.[16]

Thus, we explicitly held that the accused has the burden of production and persuasion as to all mitigating circumstances, including "substantially impaired capacity" under § 413(g)(4).

■ Nevertheless, Trimble urges that a different result should be reached here because he had successfully met his burden of production on the insanity issue during the guilt stage of the trial. This contention, however, has several analytical flaws. First, the sentencing proceeding of § 413 is a separate and distinct proceeding; the burdens of production and persuasion at the guilt stage have no application in the sentencing proceeding. The parties—especially the defendant—are given a second chance to prove facts helpful to their case. This can only help a defendant in Trimble's position, because his insanity defense was rejected at the guilt stage.

■ Second, a finding that the defendant has generated an insanity issue at trial certainly does not mean either that he has proved that issue by a preponderance of the evidence or that the burden of persuasion on that issue should be shifted in the sentencing proceeding. To meet the burden of production on the insanity issue, a defendant must present evidence that could raise a doubt in a reasonable juror as to the sanity of the defendant. *Bradford v. State*, 234 Md. 505, 200 A.2d 150 (1964). This is a relatively light burden because the State shoulders the ultimate persuasion burden beyond a reasonable doubt. C. McCormick, *McCormick on Evidence* 790–91 (2d ed. 1972). Obviously, raising a doubt about sanity is a far cry from proving insanity by a preponderance of the evidence.

---

**16.** In *Tichnell I,* we also construed § 413(h)(2), which provides that the trier of fact shall determine whether "the mitigating circumstances outweigh the aggravating circumstances," to place the burden of persuasion on the prosecution. *Id. See* Note, *Tichnell v. State—Maryland's Death Penalty: The Need for Reform,* 42 Md.L.Rev. 875, 880 (1983).

**416**

■■■■■■ Therefore, satisfying the burden of production during the guilt stage does not require shifting the burden of persuasion to the state at a different stage. The allocations of the burdens of proof and persuasion are essentially policy decisions, constrained only by constitutional considerations, that are influenced by judgments about the risk of error, the relative positions of the parties, and procedural efficiency.[17] In the guilt stage of criminal trials, this court has held that such policy considerations require that the State shoulder the burden of persuasion on the insanity issue. *Bradford v. State*, 234 Md. 505, 200 A.2d 150 (1964). In the sentencing phase of a death penalty case, however, the legislature has made the policy choice that the accused shoulders the burden of persuasion to show a somewhat broader form of insanity.[18] That policy choice must be and is respected by this Court.

### VIII

Trimble next maintains that imposing the death penalty on persons under eighteen years of age [19] constitutes cruel and unusual punishment in violation of the Eighth Amendment [20] and Articles 16 and 25 of the Maryland Declaration

---

**17.** *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re: Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952); *Tichnell v. State*, 287 Md. 695, 415 A.2d 830 (1980); *Bradford v. State*, 234 Md. 505, 200 A.2d 150 (1964).

**18.** Section 413(g)(4) includes mental incapacities, emotional disturbances, and intoxication as possible causes of incapacity, while the insanity statute, Md. Health-General Code § 12–107, includes only mental disorders or mental retardation.

**19.** Trimble was born on November 5, 1963, and the offense was committed July 3, 1981, making him 17 years and eight months old at the time of the offense.

**20.** The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

of Rights.[21] This question has not been decided by the Supreme Court; it was presented to that Court but expressly left open in *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Nevertheless, we discern from other Supreme Court cases the principles necessary to resolve this issue. These cases lead us to conclude that the Eighth Amendment does not shield Trimble from capital punishment.

## A

Any review of Supreme Court case law on capital punishment must begin with *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The *Furman* Court, in a *per curiam* opinion, struck down the capital-punishment statutes in Georgia and Texas. Each justice wrote an individual opinion either concurring in or dissenting from the judgment. One justice took the position that the death penalty's discriminatory impact rendered it unconstitutional. *See id.* at 240, 92 S.Ct. at 2727, 33 L.Ed.2d at 350 (Douglas, J., concurring). Two justices found the death penalty to be cruel and unusual punishment in all circumstances. *See id.* at 257, 92 S.Ct. 2736, 33 L.Ed.2d at 360 (Brennan, J., concurring); *id.* at 315, 92 S.Ct. at 2765, 33 L.Ed.2d at 393 (Marshall, J., concurring). The two other justices supporting the judgment did so on narrower grounds, finding that the statutes at issue were unconstitutional because the death penalty was imposed in a wanton, freakish, or infrequent manner with little basis for distinguishing the few sentenced to die from the many spared the ultimate penalty. *See id.* at 307, 92 S.Ct. at 2760, 33 L.Ed.2d at 388 (Stewart,

---

**21.** Article 16 provides:
> That sanguinary laws ought to be avoided as far as it is consistent with the safety of the State; and no law to inflect cruel and unusual pain and penalties ought to be made in any case, or at any time, hereafter.

Article 25 provides:
> That excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted, by the Courts of Law.

J., concurring); *id.* at 310, 92 S.Ct. at 2763, 33 L.Ed.2d at 390 (White, J., concurring).

Four years later, the Supreme Court's analysis of the Eighth Amendment as applied to capital punishment became more crystallized in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In *Gregg* and its companion cases,[22] a plurality of the Supreme Court upheld five post-*Furman* death-penalty statutes. Six justices, in two different opinions, agreed that the statutes were constitutional because they were carefully drafted to give the sentencing authority adequate information and guidance in the exercise of its discretion. *See id.* at 158, 96 S.Ct. at 2918, 49 L.Ed.2d at 866 (opinion of Stewart, J., joined by Powell and Stevens, JJ.); *id.* at 207, 96 S.Ct. at 2941, 49 L.Ed.2d at 893 (opinion of White, J., joined by Burger, C.J., and Rehnquist, J.). The Court also placed reliance on the elaborate procedural checks built into the statutes—bifurcated trials, mandatory appellate review, proportionality review—that served to reduce further the risk of arbitrary or discriminatory application. *See id.*

More important for our purposes here, the *Gregg* Court began to develop more of a consensus as to a general approach to Eighth Amendment claims. Reviewing the history of the Eighth Amendment, the *Gregg* plurality noted that the Court had abandoned the early, more narrow approach of determining only whether any given method of execution was torturous or barbarous. *See, e.g., Wilkerson v. Utah*, 99 U.S. 130, 25 L.Ed. 345 (1879); *In re Kemmler*, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). Instead, the Court interpreted the Amendment in a more flexible, dynamic manner, noting that the provision may acquire new meaning "from evolving standards of decency that mark the progress of a maturing society." *Gregg*, 428 U.S. at

---

**22.** *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

173, 96 S.Ct. at 2925, 49 L.Ed.2d at 874 (quoting *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). Thus, "public perceptions of the standards of decency" became a central focus in Eighth Amendment jurisprudence. The *Gregg* Court also observed, however, that public perception alone does not answer all Eighth Amendment concerns: The Court must also satisfy itself the more abstract notions of excessiveness are not offended. *See id.*

The *Gregg* Court therefore reaffirmed several earlier cases not involving the death penalty; these cases invalidated the punishment of denaturalization for the desertion from the Army, the punishment of hard labor for falsifying a document, and any punishment applied for the "offense" of being a drug addict. *See Trop v. Dulles, supra* (denaturalization); *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910) (hard labor); *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (drug addiction). In all these cases, the Court had determined that the punishment imposed was, as an abstract matter and as a matter of public perception, excessive in proportion to the offense at issue.

This more generalized approach to Eighth Amendment claims continued to solidify after *Gregg.* In *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), a plurality of the Court found that the death penalty for the crime of rape of an adult woman was a "grossly disproportionate and excessive punishment." *Id.* at 592, 97 S.Ct. at 2866, 53 L.Ed.2d at 989. And in *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), a majority of the Court held that the death penalty is unconstitutional when imposed on a person "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 458 U.S. at 797, 102 S.Ct. at 3376, 73 L.Ed.2d at 1151.

In both *Enmund* and *Coker,* the Court employed essentially the same two-fold analysis first articulated in *Gregg.*

First, the Court sought to determine whether "evolving standards of decency" had rejected capital punishment for the offense at issue. The Court identified several sources of evidence to assess these standards: state death-penalty legislation, jury verdicts in death-penalty cases, executive commutations, and scholarly and international views. Second, the Court evaluated the offense actually committed, and that same offense in general, to determine whether the penological purposes of the death penalty would be served by its imposition in that particular instance. In both cases, the Court found that, as an empirical matter, society had rejected capital punishment for rape and for accomplice liability. And in both cases, the Court also found that the purposes of the death penalty—principally deterrence and retribution—were not served for either offense.

Finally, in *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Supreme Court was faced with the question now presented here: whether the imposition of capital punishment on a juvenile is cruel and unusual punishment. The Court, however, expressly avoided that issue, instead deciding the case on the ground that the death sentence imposed on a sixteen-year-old defendant should be vacated because the sentencing judge refused to consider various mitigating circumstances as required by *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Other courts, however, have addressed this issue, all concluding in summary fashion that the Eighth Amendment does not forbid capital punishment of juveniles. *Eddings v. State*, 616 P.2d 1159 (Okla.Crim.App.1980); *State v. Valencia*, 124 Ariz. 139, 602 P.2d 807 (1979); *State v. Harris*, 48 Ohio St.2d 351, 359 N.E.2d 67 (1976); *Ice v. Commonwealth*, Ky., 667 S.W.2d 671 (1984).

 ▮ Thus, based on our reading of Supreme Court case law, we perceive our analysis here to be as follows: First, we must ascertain, using objective indicia to the extent possible, society's "evolving standards of decency" with respect to capital punishment of juveniles. Second, we

must then satisfy ourselves that capital punishment of juveniles does in fact serve a penological purpose and is not excessive in this instance.

## B

Our first task is to determine whether society has rejected capital punishment as a means of enforcing the criminal law for juvenile offenders. One of the more probative gauges of society's standards, the acts of state legislatures, is illuminative. We note first that the Maryland legislature has not seen fit to prohibit capital punishment of juveniles. *See* Md.Cts. & Jud.Proc.Code § 3–804(d)(1); Md.Code Art. 27, § 413. This legislative judgment, like all others in our limited exercise of judicial review, not only is entitled to a presumption of validity, but is persuasive evidence that at least this segment of society has not rejected capital punishment of juveniles. *Gregg v. Georgia*, 428 U.S. at 175–76, 96 S.Ct. at 2926, 49 L.Ed.2d at 876. In fact, the Maryland legislature, expressing society's preferences in a democratic society, has recognized that some juveniles are simply not amenable to the more benign treatment afforded most juvenile offenders. *See* Md.Cts. & Jud.Proc.Code § 3–804.

On a national level, the judgment of the Maryland Legislature is hardly aberrational. Out of the 39 states that currently provide for capital punishment, 29 states permit the execution of juveniles in some circumstances.[23] This is

**23.** Ala.Code, §§ 12–15–34, 13A–5–51 (1982); Ariz.Rev.Stat.Ann. § 13–703 (Supp.1982); Ark.Stat.Ann. § 41–617 (Supp.1983), § 41–1301–41–1304 (Supp.1979); Del.Code Ann., titl. 10, § 938, titl. 11, § 4209 (Supp.1982); Fla.Stat.Ann. §§ 39.02(5)(a), 921.141 (West.Supp.1984); Ga.Code Ann. §§ 15–11–5, 17–10–30 (Supp.1982); Idaho Code, §§ 16–1806, 19–2515 (Supp.1984); Ind.Code Ann. §§ 31–6–2–4, 35–50–2–9 (Burns 1984); Ky.Rev.Stat.Ann. §§ 208.170, 532.030 (Baldwin Supp.1980); La.Rev.Stat.Ann. §§ 13:1570, 14:30 (West.Supp.1983); Md.Cts. & Jud.Proc.Code Ann. § 3–804(d)(1) (Supp.1983), Md.Code Ann. Art. 27, §§ 412, 413 (Supp.1983); Miss.Code Ann. §§ 43–23–29, 99–19–101 (Supp.1983); Mo.Ann.Stat. §§ 211.071, 565.030–.035 (Vernon Supp.1984); Mont.Code Ann. §§ 41–5–206, 46–18–305 (Supp. 1983); Neb.Rev.Stat. §§ 43–202.02, 29–2523 (Supp.1979); Nev.Rev. Stat. §§ 62.080, 200.035 (1979); N.H.Rev.Stat.Ann. §§ 169:21, 630:1

not only an outright majority of all states, but it is a substantial majority of those states providing for capital punishment. This canvass of jurisdictions provides a probative indication that contemporary society has not rejected capital punishment of juveniles, but has chosen, through its elected representatives, to allow it in certain circumstances.

Another relevant gauge of contemporary standards, jury verdicts in capital cases, is more ambiguous. Although arguably this source is more probative of society's actual feelings toward the death penalty, because it involves citizens actually imposing the penalty rather than vicariously passing an abstract statute through elected representatives, jury verdicts may have empirical problems that cast some doubt on their reliability. *Enmund v. Florida*, 458 U.S. at 816–18, 102 S.Ct. at 3387, 73 L.Ed.2d at 1164–65 (O'Connor, J., dissenting). Nevertheless, they give some indication of contemporary standards. The most recent statistics with which we have been furnished indicate that only seventeen inmates currently on death row, out of approximately 800 total death row inmates, committed their offense while under age eighteen.[24] This statistic, although it does not control for such factors as prosecutorial discretion and the requirements of the various state statutes, nevertheless

---

(1983); N.J.Rev.Stat. §§ 2A:4–47, 2C:11–3 (1982); N.C.Gen.Stat. §§ 7A–608, 15A–2000 (Supp.1981); Okla.Stat.Ann. titl. 10, § 1112, titl. 21, § 701.7–701.13 (West.Supp.1982); Pa.Stat.Ann. titl. 42, § 6355, titl. 18, § 1311 (Purdon Supp.1982); S.C.Code Ann. §§ 20–7–430, 16–3–20 (Supp.1983); S.D. Codified Laws Ann. §§ 26–8–22.7, 26–11–4, 23A–27A–1–23A–27A–3 (Supp.1983); Tenn.Code Ann. §§ 37–1–34, 39–2–203 (1983); Tex.Fam.Code § 54.01 (1983), Tex.Penal Code § 19.03 (1983); Utah Code Ann. §§ 78–3a–25, 76–3–207 (Supp.1983); Va.Code §§ 16.-1–269, 19.2–264.4 (Supp.1982); Wash.Rev.Code Ann. §§ 13.40.110, 10.-95.070 (Supp.1984); Wyo.Stat. §§ 14–6–237, 6–4–102 (Supp.1982).

**24.** Brief of Petitioner at 19a (App. E), *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In addition, according to these statistics, 13 persons on death row were 18 years of age at the time of the offense, and 33 persons were 19 years old at the time of the offense, for a total of 63 persons under age 20 on death row as of May 1, 1981. *Id.*

shows some reluctance on the part of juries to sentence juveniles to death.

On the international level, one study found that out of 101 countries with a minimum age for capital punishment, 17 set the minimum age at 18, and 77 set it at age 20. Sixteen countries either do not have a minimum age or did not provide adequate information. Patrick, *The Status of Capital Punishment: A World Perspective*, 56 J.Crim.L., Crim. & Pol.Sci. 397 (1965). On the other hand, the International Covenant on Civil and Political Rights and the American Convention on Human Rights have called for the abolition of capital punishment of juveniles. And, closer to home, the Model Penal Code has recommended that the death penalty be withheld from juvenile offenders. *See* Model Penal Code § 210.6(1)(d) (1962).

■■■ Based on this evidence, we are unable to conclude that society's contemporary standards of decency have rejected capital punishment of juveniles. Even though few juvenile offenders are currently on death row, several other countries forbid it, and a significant body of scholarly thought rejects it, a firm majority of states still permit capital punishment of certain offenders under 18. This legislative judgment, in our view, is the most probative evidence of societal standards. Moreover, we must not lose sight of the purpose of this limited inquiry in the context of judicial review of a statute: we are to determine only whether society has rejected capital punishment of juveniles, not whether society should reject it, nor whether society eventually will reject, nor whether were we legislators rather than judges would reject it. Thus, the burden is on those seeking to overturn the legislature's judgment, a burden that has not been satisfied in this instance.

■■■ The Maryland Legislature's treatment of juveniles is entirely consistent with this country's overall treatment of juvenile offenders. True, juveniles "have a very special place in life which the law should reflect," *May v. Anderson*, 345 U.S. 528, 536, 73 S.Ct. 840, 844, 97 L.Ed. 1221, 1228

(1953) (Frankfurter, J., concurring), yet the law has long recognized that not all juveniles are susceptible to such benign treatment. Rather, Maryland like most states provides in its juvenile code that certain juveniles are to be treated as adults. *See* Md.Cts. & Jud.Proc.Code § 3–804. This policy decision is predicated on the belief that juveniles who commit certain crimes, especially murder, should be fully accountable as adults. This reflects not only penological goals of retribution and deterrence, but also the pragmatic recognition that the overtaxed juvenile system simply cannot handle serious juvenile offenders. These judgments, reached in the course of representative democratic processes, are not inconsistent with evolving standards of decency.[25]

## C

The second facet of the Supreme Court's Eighth Amendment jurisprudence analyzes the particular offense for which the death penalty was imposed and its relationship to the purposes of capital punishment. We note first that this inquiry is presented in a slightly different light in this case, because here it is the offender, not the offense, that is the focus. Thus, in the absence of any guidance from the Supreme Court to the contrary, we will examine both the offender and the offense to determine whether the death penalty is excessive in this instance.[26]

---

**25.** In comparison, the Supreme Court in *Coker* found that only three states sanctioned the death penalty for rape of an adult woman, and that 72 persons had been executed for that particular crime between 1955 and 1977. And in *Enmund,* the Court found that only nine states authorized capital punishment for "nontriggerman" accomplices, and only six such offenders had been executed since 1954. These numbers led the Court to conclude that societal standards rejected the death penalty in both instances. We view the empirical data here—29 states, and 17 juveniles on death row—to be significantly different and thus they support a different result.

**26.** In *Enmund,* the Supreme Court did examine the subjective culpability of the accused in this context, so our approach here has support in Supreme Court case law.

In *Gregg v. Georgia,* the Supreme Court discussed at length the penological purposes behind the death penalty:

The death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders.

In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

"The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they 'deserve,' then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law". *Furman v. Georgia, supra,* [408 U.S.] at 308, [92 S.Ct. at 2761] (Stewart, J., concurring).

Retribution is no longer the dominant objective of the criminal law, *Williams v. New York,* 337 U.S. 241, 248 [69 S.Ct. 1079, 1084, 93 L.Ed. 1337] (1949), but neither is it a forbidden objective nor one inconsistent with our respect for the dignity of men.

*Furman v. Georgia,* 408 U.S. at 394–395 [92 S.Ct. at 2806–2807] (Burger, C.J., dissenting); *id.,* at 452–54 [92 S.Ct. at 2835–2836] (Powell, J., dissenting); *Powell v. Texas,* 302 U.S., at 531, 535–536 [88 S.Ct. at 2153, 2155–2156] (plurality opinion). Indeed, the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.

\* \* \* \* \* \*

Although some of the studies suggest that the death penalty may not function as a significantly greater deterrent than lesser penalties, there is no convincing empirical evidence either supporting or refuting this view. We may nevertheless assume safely that there are murderers, such as those who act in passion, for whom the threat of death has little or no deterrent effect. But for many others, the death penalty undoubtedly is a significant deterrent. There are carefully contemplated murders, such as murder for hire, where the possible penalty of death may well enter into the cold calculus that precedes the decision to act. And there are some categories of murder, such as murder by a life prisoner, where other sanctions may not be adequate.

The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts. *Furman v. Georgia, supra,* [408 U.S.] at 403–405 [92 S.Ct. at 2810–2812] (Burger, C.J. dissenting). Indeed, many of the post-*Furman* statutes reflect just such a responsible effort to define those crimes and those criminals for which capital punishment is most probably an effective deterrent.

*Gregg v. Georgia,* 428 U.S. at 183–86, 96 S.Ct. at 2929–31, 49 L.Ed.2d at 880–82. (footnotes omitted).

■ Thus, the question here is whether society's interests in retribution and deterrence are served by imposing capital punishment for a rape-murder committed by a person four months shy of his eighteenth birthday. Even though society's interest in retribution is focused mainly on the crime, not the defendant, we do not believe that consideration of the defendant's age is irrelevant. Society's "moral outrage" may be tempered somewhat by the youthful age of the perpetrator; hence the alternate "response" of treatment in the juvenile system. Nevertheless, society's interest in retribution is by no means inapplicable in juve-

nile cases: In extreme cases, the benign goals of the juvenile system are subordinated to the more broad-based and immediate interest in retribution. In short, a particularly heinous act can take the juvenile outside of the protective umbrella of the juvenile system.

We believe that just such a crime was committed here. Trimble's crime was not a youthful prank; it was a cold, brutal act of repeated and sadistic violence. The trial judge was presented with psychiatric testimony indicating that Trimble's prospects of rehabilitation were bleak. Thus, the one factor that could temper society's justifiable moral outrage was noticeably absent. In these circumstances, the death penalty is not an unjustified response solely because the perpetrator of these acts was four months shy of his eighteenth birthday.

By contrast, the Supreme Court found that society's interest in retribution was not served in *Enmunds,* where the defendant was only vicariously liable for the murder under the felony-murder rule. The Court stated: "Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts." *Enmund,* 458 U.S. at 801, 102 S.Ct. at 3378, 73 L.Ed.2d at 1154. Here, however, Trimble committed the murder by his own hand and with criminal intent. Thus, society's retributive ends will be served by responding with capital punishment notwithstanding Trimble's age.

The second major purpose of capital punishment—deterrence—involves different considerations. Addressing murder in general, the *Gregg* Court concluded that capital punishment "undoubtedly is a significant deterrent." *Gregg,* 428 U.S. at 185–86, 96 S.Ct. at 2931, 49 L.Ed.2d at 881. Looking, as the *Enmund* Court directed, at the subjective culpability of the individual offender, *Enmund,* 457 U.S. at 797, 102 S.Ct. at 3376, 73 L.Ed.2d at 1151, we again are persuaded that the death penalty measurably contrib-

utes to society's interest in deterrence so capital punishment in this case will not be a "purposeless and needless imposition of pain and suffering." *Coker* at 592, 97 S.Ct. at 2866, 53 L.Ed.2d at 989.

This is not a case like *Enmund* where the deterrent function of the criminal law could not operate because the defendant did not intend to kill the victim. Trimble's culpability level was unaffected by his age, which was only four months from the age of majority. Imposition of the death penalty in this instance will send a message to others contemplating similar acts that society will respond harshly to their actions. In short, we believe that seventeen-year-old youths can be deterred from committing brutal rape-murders, so the legislature's judgment in that regard is not a purposeless act.

The imposition of the death penalty in this instance measurably serves society's weighty interests in both retribution and deterrence. Thus, Trimble's sentence is "more than the purposeless and needless imposition of pain and suffering." *Coker* at 592, 97 S.Ct. at 2866, 53 L.Ed.2d at 989. Nor is the capital sanction "grossly out of proportion to the severity of the crime," *id.*, in this case a brutal rape-murder. For Eighth Amendment purposes the punishment is therefore constitutionally permissible.

■ We wish to emphasize the narrowness of our constitutional holding today. We do not hold that the death penalty is constitutionally permissible as applied to all juveniles, nor do we hold that any particular chronological age serves as a bright line under which the death penalty may not be imposed. We simply hold that on the facts of this case, Trimble's age—17 years and 8 months—does not engage the Eighth Amendment as a shield to capital punishment. We believe that such a case-by-case approach not only affords the accused the individualized consideration warranted in death-penalty cases, but it also avoids the arbitrary line-drawing that is endemic to any hard-and-fast distinction between juveniles and non-juveniles. *See Coker*

*v. Georgia,* 433 U.S. at 601, 97 S.Ct. at 2870, 53 L.Ed.2d at 995 (Powell, J., concurring).

## IX

Trimble next challenges his sentence on the ground that it is inconsistent with the penalty imposed in this State for other rape-murderers who share his traits. In other words, he contends that his death sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

The procedure for our review is mandated in Md.Code (1957, 1982 Repl.Vol.), Article 27, § 414. We first articulated the procedure for our function in *Tichnell v. State,* 297 Md. 432, 468 A.2d 1 (1983) (*Tichnell III*). There, we recognized that the purpose of proportionality review under § 414(e) [27] is substantially to eliminate "the possibility that a person will be sentenced to die by the action of an aberrant jury," so that if the time comes "when juries generally do not impose the death sentence in a certain kind of murder case," this Court can vacate the death sentence. *Id.* at 457, 468 A.2d 1 (quoting *Gregg v. Georgia,* 428 U.S. at 206, 96 S.Ct. at 2940, 49 L.Ed.2d at 893).

We have examined the record and find no basis to conclude that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

---

27. Section 414(e) states in full:

(e) Considerations by Court of Appeals.—In addition to the consideration of any errors properly before the Court on appeal, the Court of Appeals shall consider the imposition of the death sentence. With regard to the sentence, the Court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or court's finding of a statutory aggravating circumstance under § 413(d);

(3) Whether the evidence supports the jury's or court's finding that the aggravating circumstances are not outweighed by mitigating circumstances; and

(4) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Nor do we find any basis to conclude that the evidence is insufficient to support the trial court's finding of the aggravating factors that the murder was committed during the course of a rape and that the victim was a hostage. The evidence is abundant that Trimble forcibly raped the victim, confined and restricted her to the vehicle, brutally assaulted her with a baseball bat about her head and body, and then slit her throat from ear to ear to make certain of her death. These facts satisfy the finding of these aggravating factors under §§ 413(d)(4) and (10). We further conclude that the trial court had a sound basis to find these aggravating factors were not outweighed by the mitigating factors that the defendant had no prior record of violent crime, that he was of a youthful age, and that he had an antisocial personality coupled with substance abuse.

However, Trimble maintains that there are others who have committed rape-murders more horrible than his case reflects and these offenders have only received a life sentence. As illustrative of his point, Trimble cites the cases of Vincent Greco, Dean Oliver, Jack Jones, William Parker, John Kevin Johnson, Theodore Wiener, and Elvis Horton, all of whom brutally raped their victims before killing them and all of whom were sentenced to life imprisonment. He argues that his crime is no more aggravating than any of these crimes.

In *Stebbing v. State*, 299 Md. 331, 473 A.2d 903 (1984), we established an inventory for rape-murders which included many of these cases. Ordinarily, that pool of cases along with any additional cases considered since we decided *Stebbing* would establish our inventory for determining the appropriateness of the death sentence for Trimble. However, because the thrust of Trimble's argument is that he was too young at the time of his crime to be sentenced to die, we shall consider other cases where the State sought the death penalty and the defendant was of youthful age. We do this even though we have already decided that the imposition of death on one of youthful age is not *per se* cruel and unusual punishment. Therefore, having reviewed

the trial judge's reports in each of Maryland's capital sentencing proceedings, we have selected certain cases as similar where rape of the victim was an aggravating factor in the murder of the victim or the defendant arguably was of youthful age at the time of the crime, or both.[28]

The cases we have selected as similar within the framework of Article 27, § 414(e)(4) are eight in number and are as follows:

*Donald Thomas Maziarz.* Age 19 years and eleven months at the time of his crimes, Maziarz was convicted of first-degree murder, two counts of first-degree rape, and robbery. He was sentenced to death by a judge of the Circuit Court for Prince George's County.

Maziarz and an accomplice met a woman at a bar and they all went to her apartment to drink and socialize. After a while Maziarz made sexual advances to the woman. When she refused he beat and raped her, after which his co-defendant raped her. The victim was then bound with a telephone cord. Maziarz turned on the gas stove in the kitchen and ignited matches in the living room. A fire resulted and Maziarz deliberately destroyed the smoke detector, which had been activated by the blaze. Maziarz then removed the victim's television from her apartment and left. An explosion occurred and the victim died of either smoke inhalation or extensive burns. The court found as aggravating factors that the murder was committed in the course of arson, rape, and robbery. As mitigating circumstances, the court found that the defendant had no prior conviction for a crime of violence, that the defendant's capacity was impaired, that the act of the defendant was not the sole proximate cause of the murder, and that the defendant was of a youthful age.

---

**28.** These criteria cause us to exclude from our consideration the cases of Dean Oliver and William Parker because in each of these cases the sentencing authority found no aggravating factors and thus the penalty for each was life imprisonment. We shall also exclude the cases of Elvis Horton, Jack Jones, John K. Johnson and Howard Hines because they were not of youthful age at the time of their crimes.

*Theodore Scott Wiener.* At the age of 19 years and 6 months, Wiener committed the crimes for which he was convicted by the Circuit Court for Baltimore County in a non-jury trial. He raped a 22-year-old female and then stabbed her 101 times. The aggravating factor of first-degree rape was found to be outweighed by the mitigating factors of lack of a record of prior violent crimes, diminished capacity, and youthful age. A life sentence was imposed by the judge.

*Vincent Tito Greco, Jr.* Age 21 years and 11 months, Greco raped and strangled to death a 78-year-old female. The trial court found that the aggravating factor or rape was outweighed by the following mitigating factors: (1) the lack of any prior record of violent crimes; (2) substantially impaired capacity; (3) youthful age; (4) unlikelihood that Greco would engage in further criminal activity if he were successfully treated; (5) Greco's kindly treatment of two young witnesses to the offense after it was committed; (6) evidence of a likelihood of rehabilitation and apparent amenability to treatment. A life sentence was imposed.

*Lawrence Johnson.* Age 17 years and ten months at the time of these offenses, Lawrence Johnson was found guilty of premeditated first-degree murder, robbery, and daytime housebreaking. On January 9, 1979, he and Dwayne Mayers broke into a residence and brutally murdered a 78-year-old woman they encountered during the course of the crime. A sentencing proceeding was held, after which the trial judge granted a motion for a new hearing because of an error in the jury instructions. At the new hearing, the sentencing jury found one aggravating circumstance: that the defendant committed the murder in the course of the robbery. The jury also found one mitigating circumstance: that the act of the defendant was not the sole proximate cause of the murder. The jury did not find that his age was a mitigating circumstance. A sentence of death was imposed.

*Lawrence Johnson.* In this case Johnson's death sentence was vacated by this Court and the case remanded for resentencing because the jury did not find as a mitigating factor the absence of any prior conviction for a crime of violence although the existence of this mitigating factor was uncontradicted on the record. *Johnson v. State,* 292 Md. 405, 439 A.2d 542 (1982). Johnson [29] was two weeks short of being 19 years old when the crimes were committed. On February 23, 1980, Johnson and his companions drove the victim (who had been abducted in her car the night before by his companions) to a wooded area where Johnson and one Dwayne Mayers each raped the victim. Then, to avoid identification, Johnson shot the victim in the head four times.

On remand, the sentencing was conducted by the trial judge. As an aggravating factor he found that the murder was committed during the course of rape. The judge also found five mitigating factors: lack of any prior conviction for a crime of violence, acting under substantial duress or domination of another person, the substantial impairment of Johnson's capacity to appreciate the criminality of his conduct, youthful age, and that a co-defendant in another murder case had received a life sentence. The trial judge concluded that these mitigating factors outweighed the aggravating factor and imposed a sentence of life imprisonment.

*Annette Louise Stebbing.* Stebbing was 19 years old when she strangled a female victim while directly assisting in the rape and sodomizing of the victim by her husband. At the sentencing proceeding, the trial judge found as an aggravating factor that the murder occurred during the course of the rape. The sole mitigating factor was that Stebbing had not been found guilty of a crime of violence. The court determined that this mitigating factor did not

**29.** Johnson was apprehended and arrested for the rape-murder on February 29, 1980; he was arrested for the robbery-murder on March 5, 1980.

outweigh the aggravating factor and sentenced Stebbing to death.

*Derrick Quinton White.* Age 18 at the time of the crime, White was found guilty of first-degree murder for the shooting death of a 61-year-old man who was riding a moped. As an aggravating circumstance, the jury found that White had committed the murder in the course of an attempted robbery. The jury found as mitigating circumstances that White (1) had not previously been convicted of a crime of violence and (2) lived in a poor environment which was conducive to unlawful conduct. The jury found, however, that these factors did not outweigh the aggravating factor of the attempted robbery. Accordingly, a death sentence was imposed.

*Brian Keith Quickley.* Age 16 at the time of the offense, Quickley was convicted of first-degree murder and robbery with a deadly weapon. He and his two brothers entered into a furniture store. While in the store, Brian shot the victim once between the eyes and then again in the neck region. The brothers then took several television sets and fled. The court found as an aggravating circumstance that the defendant committed the crime in the course of a robbery. The court found as mitigating circumstances the defendant's youthful age, his low intelligence, and his impoverished environment. A life sentence was imposed.

To summarize, the pool of cases we have selected for comparison comprises 5 rape-murders and 3 robbery-murders. The ages of the defendants range from 16 to 21 years. In the 2 rape-murders where the death penalty was imposed the defendants were 19 years old. In the 2 robbery-murder cases where the death penalty was imposed, the defendants were 17 and 18 years old at the time of their crimes.

We see no bright line by which this Court can say when death shall be imposed. Moreover, we believe the guidelines established by the legislature represent the clearest course of action in attempting to resolve this problem.

Nevertheless, Trimble argues that the death penalty has not been imposed on a juvenile for rape-murder. Again we say while the youthful age of the offender is a relevant mitigating factor, it alone does not end the weighing process. Here, the sentencing authority had before it a wealth of information about Trimble's character. Trimble was expelled from school while in the 10th grade after several suspensions. At the time of the offense, he had been steadily employed at an airport for seven months. He maintained a steady relationship with a girlfriend. In addition to his low intelligence, he was diagnosed as having antisocial personality, possible temporary organic psychosis, and possible schizophrenia but nevertheless criminally responsible. These characteristics were exacerbated by his drug and alcohol abuse.

According to the psychiatric testimony, his criminal behavior was part of his lifestyle (he regarded Charles Manson as a role model) and a matter of choice. Trimble freely admitted his involvement in ten breaking and entering crimes, a handgun violation, an assault, and several drug arrests. He further admitted a pattern of sadistic behavior toward his girlfriend and animals. The psychiatrists determined his prospects for rehabilitation to be bleak because he had no respect for the rights of others. In our view, the trial judge who sentenced him to death could reasonably conclude that Trimble was an adult beyond repair rather than a juvenile in need of treatment.

■ We have said that under the federal constitution Trimble is not, because of his age, shielded from the death penalty. We further see no obstacle presented by § 414(e)(4), our state constitution, or the Declaration of Rights to prevent the imposition of the death penalty on account of his age. Trimble's ability to realize his actions were wrong and to conform his conduct to the letter of the law were not impaired by his age. We hold that the death sentence imposed on this defendant was neither excessive

nor disproportionate to the penalty imposed in similar cases in this State.

Trimble also maintains that his sentence is disproportionate because his co-defendants were allowed to plead guilty to first-degree murder and avoid the death penalty. The short answer to this argument is that Trimble's co-defendants were ineligible for the death penalty because they were not principals in the first degree to the murder. *See* § 413(e)(1) of Art. 27. Trimble places particular emphasis on co-defendant Anthony Kordell, who testified for the State and was given a suspended sentence. The sentences of Trimble's accomplices do not, in our view, render Trimble's sentence disproportionate. First, the characteristics and conduct of each individual are a prime focus of proportionality review, so that the conduct of the accomplices has no bearing on the heinous crime committed by Trimble himself. The accomplices were far less culpable than Trimble. Although other accomplices raped the two women, it was Trimble himself who brutally beat Rogers and slit her throat. This conduct plainly distinguishes Trimble from the others, making different treatment appropriate. Second, mechanically linking the sentence of an accomplice to Trimble's own sentence has several unfortunate results: it places an artificial limitation on an offender's sentence; it restricts the plea-bargaining process in multiple-defendant cases; it prevents the individual consideration of each sentence required in capital cases. Therefore, we hold that Trimble's sentence is proportionate notwithstanding the lesser sentences received by his accomplices.

## X

Trimble lastly argues that the Maryland capital-punishment statute is unconstitutional on a number of grounds. We have previously addressed and rejected each of his arguments, and consider the constitutional issues to be resolved. *Calhoun v. State*, 297 Md. 563, 468 A.2d 45

(1983); *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980) (*Tichnell I*).

JUDGMENT AFFIRMED WITH COSTS.

DAVIDSON, Judge, dissenting:

The majority here holds, among other things, that the trial judge did not abuse his discretion in overruling an objection to a portion of the State's Attorney's closing argument. It finds that the objected to portion of the closing argument was nothing more than an effort to attack the credibility of an expert witness. In my view, the objected to portion of the closing argument constituted a contradiction of the trial judge's previous ruling that the sole defense psychiatrist was qualified and competent and, consequently, that his expert opinion, that as a result of mental disorders the appellant was unable to conform his conduct to the requirements of law, was admissible. It also contradicted the trial judge's binding instruction that the jury should consider, among other things, the defense psychiatrist's expert opinion. Under established Maryland law, a ruling and binding instruction on such matters cannot be disputed by counsel in argument to the jury. Accordingly, I respectfully dissent.

Here the record shows that the appellant was 17-years old at the time of the commission of the crimes. The record further shows that the appellant's sole defense was insanity. The appellant called only one witness, Dr. Robert B. Lehman (defense psychiatrist), who testified that he was graduated from the University of Maryland School of Medicine in 1971; that in that year he was licensed to practice medicine in the State of Maryland; that he was trained in general psychiatry and child and adolescent psychiatry at the Sheppard-Pratt Hospital; that for seven years he had been in private practice specializing in adolescent and child psychiatry; that he was on the staff of the Baltimore County General Hospital; that he was a clinical instructor in child and adolescent psychiatry at the University of Maryland School of Medicine; and that his clinical and

educational skills in psychiatry were certified to by the American Board of Psychiatry and Neurology.

When defense counsel asked that the defense psychiatrist be qualified as an expert witness, the State indicated that it had "no questions" and did not cross examine the defense psychiatrist with respect to his qualifications. The trial judge then ruled that the defense psychiatrist was qualified as an expert. The State did not object to the trial judge's ruling.

The record further shows that the defense psychiatrist gave oral testimony and submitted a written report in which, among other things, he expressed the opinion that, as a result of mental disorders, the appellant was unable to conform his conduct to the requirements of law. The State did not object to the admission of this evidence.

After the State and the defense rested, the trial judge instructed the jury. With respect to expert testimony, the trial judge said:

"You will recall we have heard several doctors or psychiatrists' testimony in this case. A witness who has special training or experience in a given field is permitted to express opinions based on observed or assumed facts to aid you in deciding the issues in this case. In weighing the opinions of experts you should consider the expert's experience, training, and skills, and the expert's knowledge of the subject matter about which he is expressing an opinion. You should give expert testimony the weight and value you believe it should have. You are not required to accept any expert's opinion. *You should consider an expert's opinion together with all the other evidence.*" (Emphasis added.)

Additionally, the record shows that in closing argument, the State's Attorney argued to the jury as follows:

"In that regard whom did the defense put on to testify that this defendant was in fact insane at the time of the offense? I submit to you nobody. *Nobody testified he was insane at the time of the offense.* Dr. Lehman

testified and Dr. Lehman has no formal training in forensic psychiatry. He has a practice limited to child and adolescent psychiatry. He is not affiliated with any State or mental hospital, and he has in the past only examined five defendants to determine their responsibility at the time of a given offense. *He,* unlike Dr. Spodak and Dr. Blumberg, *is eminently unqualified to give an opinion* seven months after the occurrence of an offense *as to what the defendant's mental state was at the time of the offense."* (Emphasis added.)

Defense counsel's objection to this portion of the argument was overruled by the trial judge.

Finally, the record shows that in closing argument, defense counsel placed heavy emphasis on the evidence of insanity adduced by the defense psychiatrist. Initially, in explaining that the State had the burden of proof on the question of sanity, he said:

"All the doctors agree he is crazy.

. . . . .

They all will agree he is crazy. Now, the job of this jury really is to determine how crazy is he. The State has to prove he is sane. The burden of proof is on them, not on us. *We have already proved that he is insane,* but the burden is on the State to prove he was sane." (Emphasis added.)

The significance of the evidence of insanity adduced by the defense psychiatrist was again stressed at the conclusion of defense counsel's closing argument when he said:

"*I also leave you with something else that is extremely important. I leave you with a copy of Dr. Lehman's report,* the same exact copy that he gave to me, not edited, not inked out, bad things as well as good. Contrary to what [the State's Attorney] says, Dr. Lehman's qualifications are very, very good. He is a specialist in adolescent psychiatry, and he is board certified. That is very difficult to get done. I have prepared a number of

copies of this report for you to take into the jury room with you to refer to." (Emphasis added.)

I agree with the majority that "both the State's Attorney and defense counsel are given wide latitude in the conduct of closing argument, including the right to explain or to attack all the evidence in the case." Nevertheless, under Maryland law, there are limitations upon the general scope of permissible closing argument. *Wilhelm v. State,* 272 Md. 404, 413–23, 326 A.2d 707, 714–20 (1974).

Under Article 23 of the Maryland Declaration of Rights,[1] as construed by this Court, there is an established dichotomy between the role of the trial judge and the jury with respect to the determination of questions of law. *Montgomery v. State,* 292 Md. 84, 91, 437 A.2d 654, 658 (1981); *Stevenson v. State,* 289 Md. 167, 178–80, 423 A.2d 558, 564–65 (1980). The jury's authority is limited to deciding "the law of the crime" or "the definition of the crime" as well as "the legal effect of the evidence." *Stevenson,* 289 Md. at 178, 423 A.2d at 564. All other legal issues are for the trial judge alone to decide. *Stevenson,* 289 Md. at 179, 423 A.2d at 565. More particularly, questions of the qualification and competency of expert and other witnesses and the admissibility of evidence are for the trial judge alone to determine and are not for the jury to decide. *Stevenson,* 289 Md. at 179, 423 A.2d at 564; *Beahm v. Shortall,* 279 Md. 321, 338, 368 A.2d 1005, 1015 (1977); *Hewitt v. Maryland State Board of Censors,* 243 Md. 574, 582, 221 A.2d 894, 898 (1966); *Turner v. State Roads Commission,* 213 Md. 428, 433, 132 A.2d 455, 457 (1957). Once evidence is admitted, the jury's function is limited to determining its weight. *Duffin v. State,* 229 Md. 434, 436, 184 A.2d 624, 625 (1962); *Rasin v. State,* 153 Md. 431, 435, 138 A. 338,

---

1. Art. 23 of the Md. Declaration of Rights provides in pertinent part:
 *"In the trial of all criminal cases, the Jury shall be the Judges of Law,* as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction." (Emphasis added.)

340 (1927); *see Bellamy v. State,* 50 Md.App. 65, 72–73, 435
A.2d 821, 825 (1981), *cert. denied,* 292 Md. 376 (1982).

A trial judge's instructions on the legal questions of the
qualification and competency of expert and other witnesses
and the admissibility of evidence are binding upon the jury
and may not be disputed by counsel in argument to the
jury. *Montgomery,* 292 Md. at 88, 437 A.2d at 656; *Stevenson,* 289 Md. at 180, 423 A.2d at 565; Md.Rule 4–325(f).[2]
Manifestly, a trial judge's rulings on qualification and competency of expert witnesses and on the admissibility of
evidence, like a trial judge's instructions on such legal
questions, are binding upon the jury and may not be disputed by counsel in argument to the jury.

The rationale underlying this principle was expressed by
this Court as long ago as 1881 in *Bell v. State,* 57 Md. 108,
120–21 (1881). There this Court said:

> "[Counsel] are still officers of the court, and under its
> proper control, and if the court expresses an opinion on a
> question of law, upon which it has a right to express it,
> and a party considers himself aggrieved by it, he has his
> remedy, either by petition in the nature of a writ of error,
> or by a bill of exception. But counsel have no right, and
> ought not to be permitted to argue against it before the
> jury, in order to induce them to disregard it."

This rationale is equally valid today. Arguments that contradict a trial judge's binding rulings and instructions on
questions of law inevitably create confusion and may well
induce the jury not to consider evidence for inappropriate
reasons—reasons that are contrary to law. While a jury
may appropriately disregard admitted expert opinion evidence after considering it and determining that it lacks
credibility and, therefore, is not entitled to any weight, it is
inappropriate for a jury to disregard such evidence without

---

**2.** Md.Rule 4–325(f) provides:
"Nothing in this Rule precludes any party from arguing that the law
applicable to the case is different from the law described in the
instructions of the court stated not to be binding."

considering it at all. Indeed, the administration of justice is not furthered by permitting counsel to encourage juries not to consider evidence for reasons that are contrary to law. Thus, it is not within the general scope of permissible closing argument to mislead the jury by inducing it to disregard the trial judge's binding rulings and instructions on questions of law.

Here the trial judge ruled that the defense psychiatrist was qualified and competent and, consequently, that his expert opinion that as a result of mental disorders the appellant was unable to conform his conduct to the requirements of law was admissible evidence to be considered by the jury. Moreover, the trial judge instructed the jury to consider that expert opinion. If the State's Attorney was of the view that the defense psychiatrist was not qualified and that his opinion was inadmissible and should not have been considered by the jury, he should have objected and preserved the issue for review. However, the State's Attorney did not object. Instead, he argued to the jury that the defense psychiatrist was "eminently unqualified" and that "[n]obody testified [that the appellant] was insane at the time of the offense." In essence, the State's Attorney argued to the jury that the defense psychiatrist was not qualified and that, consequently, his opinion was inadmissible and should not be considered by the jury.

In sum, the State's Attorney's argument was not merely an attack on the credibility of the defense psychiatrist. Rather, it was a contradiction of the trial judge's previous ruling and binding instruction. It was, therefore, misleading and confusing. The State's Attorney had no right and ought not to have been permitted to induce the jury not to consider the defense psychiatrist's expert opinion on the question of sanity for inappropriate reasons—reasons contrary to the trial judge's previous ruling and binding instruction, and therefore contrary to law. In my view, the objected to portion of the State's Attorney's closing argument exceeded the scope of permissible closing argument.

In this case, the appellant's sole defense was insanity. The defense psychiatrist was the only witness that the appellant called. At the time of the trial in this case, the State had the burden to prove beyond a reasonable doubt that the appellant was sane at the time the criminal acts were committed.[3] *Bradford v. State,* 234 Md. 505, 513, 200 A.2d 150, 155 (1964). Consequently, at the moment of truth, the jury's verdicts depended upon whether the evidence presented by the defense psychiatrist was sufficiently compelling to raise a reasonable doubt as to the appellant's sanity. The State's Attorney's improper closing argument may well have misled and confused the jury, and induced it, for inappropriate reasons, not to consider the only evidence presented by the appellant to raise a reasonable doubt. Under these circumstances, I cannot, upon reviewing the record, declare a belief beyond a reasonable doubt that the objected to portion of the State's Attorney's closing argument in no way influenced the jury's verdicts. Accordingly, I would reverse the convictions and remand the case for a new trial.[4]

---

3. Chapter 501 of the 1984 Laws of Maryland, effective 1 July 1984, provides in pertinent part:
 "12–209. Not Criminally Responsible—Plea and Verdict.

 . . . . .

 "(b) Burden of Proof.
 "The defendant has the burden to establish, by a preponderance of the evidence, the defense of not criminally responsible."

4. In light of this conclusion, I need not consider the other issues addressed in the majority opinion.