*Michael D. Joiner v. State of Maryland*, No. 1949, Sept. Term, 2023. Opinion filed on May 30, 2025, by Wells, C.J.

**CRIMINAL LAW – DEFENSE – HABITATION**

Under Maryland case law, the trial court must give a specific instruction to the jury when three conditions are met: (1) the instruction is a correct statement of the law, (2) the instruction is applicable under the facts of the case, and (3) the contents of the instruction were not fairly covered elsewhere in jury instructions actually given. The defense of habitation applies when a defendant has used deadly force in response to a reasonable belief that the victim intended to commit a felony in the home or to inflict serious bodily harm or death on the inhabitants of the home. The only difference between defense of the home and defense of the person is defense of the home does not require a duty to retreat.

The trial court in this case was not required to give the defense of habitation instruction because it was not applicable to the facts of this case. There was no evidence from which a jury could conclude either victim, Ted Rill or Lester Rill, entered or attempted to enter Joiner's home. Additionally, the trial court was not required to give the instruction because its contents were fairly covered in the trial court's self-defense instruction that advised the jury Joiner had no duty to retreat if he was in his home or upon the curtilage of his home.

**CRIMINAL LAW – TESTIMONY – OPENED DOOR DOCTRINE**

The opened door doctrine permits a party to introduce evidence that might not be admissible in order to respond to certain evidence put forth by opposing counsel. The doctrine is applicable where the cross-examination of a witness has expanded the scope of the witness's testimony on direct.

In this case, Joiner first elicited Corporal Theodore Buck's opinion of the identity of the aggressor at the early stages of the investigation. In doing so, Joiner opened the door for the State, on redirect, to rebut the significance of that evidence by asking Corporal Buck whether his opinion as to the identity of the aggressor changed during the course of the investigation. Accordingly, the trial court did not err in permitting the State to elicit Corporal Buck's testimony.

**CRIMINAL LAW – IMPEACHMENT – PRIOR CONDUCT**

Maryland Rule 5-608(b) permits the impeachment of a witness based on their own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness. Acts of misconduct are only relevant if they logically relate to a witness's character for untruthfulness. Additionally, when impeachment is the aim, the relevant inquiry is not whether the witness has been accused of misconduct by some other person, but whether the witness actually committed the prior bad act. To overcome an

objection, the proponent must demonstrate a reasonable factual basis for asserting the conduct occurred.

In this case, the court properly sustained the State's objection when Joiner attempted to cross-examine Ted Rill about a police report containing accusations that Rill pointed a gun at someone. Joiner's examination was not logically related to Rill's character for untruthfulness, and it was a hearsay accusation of Rill's guilt.

**CRIMINAL LAW – DEFENSE – SUFFICIENCY OF EVIDENCE**

To be entitled to a jury instruction with respect to self-defense or defense of others, the defendant has the burden of initially producing some evidence on the issue of mitigation or self-defense sufficient to give rise to a jury issue. Once the issue has been generated by the evidence, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. To defeat a motion for judgment of acquittal where a claim of self-defense or defense of others has been raised, it is not necessary for the State to affirmatively negate any evidence tending to support such a claim. It is up to the jury to decide whether evidence that the defendant acted in self-defense or in defense of others is worthy of belief.

While Joiner's testimony in this case may have generated the issue of self-defense and defense of others for the jury's consideration, that evidence did not establish he was entitled to judgment in his favor as a matter of law. The jury was free to disbelieve Joiner's testimony that Ted Rill threatened to kill him and his family, and Rill initiated the confrontation. Alternatively, the jury could have reasonably concluded the degree of force used by Joiner was unreasonable. Accordingly, the court did not err in denying Joiner's motion for judgment of acquittal.

Circuit Court for Carroll County
Case No. C-06-CR-23-000119

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1949

September Term, 2023

_____

MICHAEL D. JOINER

v.

STATE OF MARYLAND
_____

Wells, C.J.,
Albright,
Eyler, Deborah S.
    (Senior Judge, Specially Assigned),


JJ.
_____

Opinion by Wells, C.J.
_____

Filed: May 30, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

A jury sitting in the Circuit Court for Carroll County convicted appellant Michael D. Joiner of two counts of first-degree assault, two counts of use of a firearm in the commission of a crime of violence, and two counts of reckless endangerment. The court sentenced Joiner to a total of 32 years and two days of incarceration, with ten years of that sentence suspended, and five years of supervised probation upon release. Joiner timely appealed and presents four questions for our review:

1. Did the circuit court err in failing to propound the defense of habitation jury instruction?

2. Did the circuit court err in permitting the State to elicit an opinion from a witness that invaded the province of the jury?

3. Did the circuit court err in restricting the defense's cross-examination of the alleged victim?

4. Is the evidence insufficient to sustain the convictions?

For the reasons that follow, we affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

We shall give a detailed recitation of the facts because of the issues presented in this appeal. The State charged Joiner with shooting Ted Rill and pointing a gun at Lester Rill, Ted's father.[1] The shooting and events that preceded it were captured on soundless video from a home security surveillance camera that was trained on Joiner's backyard and the backyard of the adjoining property. The defense theory of the case was Joiner acted in self-

---

[1] Several of the individuals who testified and/or were discussed in the testimony of others share the same surname, Rill. For clarity and ease of reading, we refer to each by their first name. We intend no disrespect in doing so.

defense and defense of others.[2]

### A. Evidence Adduced by the State

Ted and Lester work for Rill's Construction company, which is owned by Rusty Rill, Lester's cousin. On January 30, 2023, a gasoline powered tamper, a piece of construction equipment used to compact soil, was stolen from a company truck.

On February 10, 2023, Joiner called Ted's mother, Vicki Parrish. Joiner told Parrish he had the tamper and it was stolen by Geen Barnhouse and Justin Heiser, both of whom were previously employed by Rill's Construction. Joiner gave Parrish his address and said the tamper could be picked up around noon that day.

Parrish relayed the information to Ted, who went with Lester to get the tamper. They arrived at Joiner's house at 12:25 p.m.

Joiner met them outside and told them the tamper was not there. He said he sold it for $1,000 and would need $1,000 to get it back. Ted called Rusty, who agreed to pay Joiner $500 on the condition that he tell the police Barnhouse and Heiser stole the tamper. Joiner agreed. Joiner told Ted and Lester to come back at 3:00 p.m. after he retrieved the tamper. Joiner gave Ted his phone number so the latter could call before returning to pick up the tamper.

Ted described the nature of the interaction with Joiner as "cordial." Lester described it as "friendly."

---

[2] As discussed later in this opinion, Joiner requested a jury instruction on a third defense known as defense of habitation. The court ruled the instruction was not generated by the evidence.

Ted and Lester left Joiner's property at 12:37 p.m., according to the surveillance video. They went to Lester's house and "had a few shots."

Joiner called Ted about an hour later and said he did not want to go forward with the deal because he did not want to talk to the police. Ted told Joiner that Rusty was going to call the police anyway. At trial when asked about this, Ted testified that he had not threatened Joiner. "I mean, it's just - - that's the facts . . . . Like you're either going to testify that [Barnhouse and Heiser] stole the tamper and gave it to you[,] or [Rusty] was going to say you . . . stole the tamper and then you've got to defend how you ain't stole it." Ted also denied that he threatened to kill Joiner and Kristen Naill, Joiner's fiancée, or that he threatened their children.

According to Ted, despite all of this, Joiner decided to go through with the plan. When the conversation ended, Ted still planned on going back to Joiner's property at 3:00 p.m. to pick up the tamper.

Approximately fifteen minutes before 3:00 p.m., Ted called Joiner to let him know he was on the way. Although Ted could not remember the conversation, he was "pretty sure" Joiner confirmed he had the tamper. Ted testified he would not have continued driving to Joiner's house otherwise. Ted denied that Joiner told him not to come back.

At 2:44 p.m., a Facebook account linked to Joiner was used to send a message to Barnhouse. The message read: "Come to the house ASAP it's important 911 [Police] involve[d] with your name you gotta come to the house so we can talk give you heads

3

up[.]"[3]

At 2:59 p.m. Ted texted Joiner: "[Rusty] was not happy he's not me he's trying to call the cops on you to say you know where it's at I'm not trying to play all that games but he's not built like us so you decide[.]" At 3:08 p.m., Ted texted Joiner: "I'm bout to pull up be outside boy."

At 3:13:56 p.m., Joiner called 911. The recording of the 911 call was admitted into evidence and played for the jury:

| Joiner: | I have a gentleman threatening to kill me and my family. I'm telling you now you need a police officer at 334 Baltimore Street or I'm shooting him. |
|---|---|
| 911 Operator: | Westminster, Taneytown? |
| Joiner: | I will shoot him. |
| 911 Operator: | Do you have a weapon, sir? |
| Joiner: | Yes, I do. This is my property. |

At 3:14:35 p.m., as seen in the surveillance video, Ted drove his work truck into the alley behind Joiner's next-door neighbor's property and immediately exited the truck. Ted testified he planned to back the truck into the neighbor's driveway to load the tamper, so as not to block the alley. Before doing so, he wanted to confirm that Joiner had the tamper because Joiner previously claimed the tamper was in his possession and then said it was

---

[3] The original message read: " . . . Please involve with your name . . ." Fifteen seconds after the original message was sent, a second message was sent to Barnhouse, which read: "Police involved*". According to Corporal Theodore Buck, who investigated the shooting, the asterisk signified a correction from "Please involve" in the first message to "Police involved".

not. Lester was in the truck with Ted, and Ted's two-year-old child.

Ted did not recall what he was doing as he got out of the truck. As the surveillance video was played during Ted's testimony, he stated he appeared to be on the phone. This was consistent with phone records in evidence demonstrating Ted placed a call to Joiner at 3:14:55, about 15 seconds after the surveillance video shows Ted getting out of the truck.

Ted testified Joiner and Naill approached him with guns and told him to get off their property. Ted backed away and said, "I'm not on your property. Chill out." He feared he would be shot in the back if he ran back to his truck, so he tried to "talk [his] way out" of the situation instead.

As Ted backed away, Naill put her gun to his head. He grabbed the gun away from her and threw it. At that point, he was shot in the buttocks. He testified, "I got shot in the ass, and that's the last thing I remember." Ted agreed that the video showed him running toward Joiner while pointing the gun. Ted said:

> I don't remember having the gun, but I . . . remember[] turning around and seeing [Joiner] and hitting . . . [b]ecause I thought he was the one that shot me . . . . I remember attacking him, but I didn't know I had the gun . . . . I thought I threw the gun over [t]here.

Lester corroborated Ted's testimony that Joiner told them to come back at 3:00 p.m. Lester testified that, on the way back to Joiner's property, Ted had a telephone conversation with Joiner, who said he had the tamper. When he and Ted got out of the truck upon arriving, "they done come out running with guns." He added: "[t]hey come out of the shed, and the one I thought was Donald [Joiner's brother] put the gun to my head. He already had the gun pointed at [Ted], and he turned around and pointed it at me. Then [Ted] dove

5

into him." Lester did not see a gun in Ted's hands.

Lester then heard three or four gunshots. He saw Ted was bleeding from his abdomen and called 911.

Ted was hospitalized for approximately six weeks and underwent several surgical procedures. Joiner sustained a gunshot wound to the right shoulder. According to the testimony of Corporal Theodore Buck, who investigated the incident, Ted shot Joiner when Ted struck him with Naill's gun.

The police searched Ted's vehicle. No weapons were found inside.

The State called Richard Roth, an audio/video enhancement and equipment technician, to testify about his analysis of the surveillance video. A slow-motion version of the video of the shooting, as well as still images that were captured from the video, were introduced into evidence. According to Roth the still images showed that Naill's gun "fl[ew] out" of Ted's hand. Roth testified: "[i]t appeared that in attempting to strike [Joiner,] that the gun went flying[.]"

The police interviewed Joiner at the hospital at 7:00 p.m., approximately five hours after the shooting. About a week later, Joiner called Corporal Buck and voluntarily gave another statement, which was consistent with his first statement.

Corporal Buck testified about a number of "discrepancies" between Joiner's version of events and evidence recovered during the investigation. For example, in one of his statements, Joiner claimed there was "tension" and a "strange feeling in the air" during the first meeting with Ted and Lester, but Corporal Buck noted the video showed the three men shaking hands and "fist bumping." Although Joiner told police Naill never pointed a

6

gun at Ted, and Ted started the physical altercation with Naill, the video showed Naill putting a gun to Ted's head before Ted got physical. Joiner said the tamper was on his property the whole time, but the tamper was not recovered during a search of the property. Corporal Buck also stated the video contradicted Joiner's claim that he never left his property during the encounter.

**B. The Defense Case**

Joiner was the only witness to testify for the defense. He said he purchased the tamper for a home improvement project. Barnhouse, who previously lived in Joiner's garage for a period of time, was helping Joiner with the project. Heiser, whom Joiner met through Barnhouse, told Joiner he could "grab" a tamper from a yard where it was "left by a subcontractor." Heiser and Barnhouse brought the tamper to Joiner, and Joiner paid them $500.

Joiner testified he did not know the tamper was stolen until five or six days later. He contacted Parrish, Ted's mother, and told her he believed he "acquired a tamper that is stolen[,]" and wanted to return it.

According to Joiner, Ted and Lester showed up at his house two days later. Joiner did not know how they got his address. He said:

> The conversation wasn't overly aggressive, but you could definitely feel that there was extra tension there. Mr. Lester kept his arms crossed pretty much the whole time. One of them stood . . . on one side of me and one stood on the other side of me pretty much the whole time . . . . I felt like it was in a very threatening manner. On top of them just showing up, . . . they were kind of more or less surrounding me at that point.

Joiner said he talked to Ted and Lester for ten or fifteen minutes "to ease the situation." He

7

testified: "You catch more bees with honey than you do with vinegar. So I tried to just smooth it, get over and just get out of the situation[.]"

Joiner told Ted and Lester he bought the tamper for $500, and he would be "grateful" to get the money back. Ted asked Joiner if he would testify against Barnhouse and Heiser, but Joiner said he did not want to get in the "midst of a family dispute."[4]

Joiner testified the tamper was in his garage at the time, but "[b]ecause of the aggressiveness," he told Ted and Lester the tamper was somewhere else because he "didn't want an altercation[.]" Joiner told them he had to leave for a meeting, he would be back around 3:00 p.m., and he would call Ted later to find out whether Rusty would agree to give him $500 for the return of the tamper.

Joiner stated that, when Ted called him around 3:00 p.m., "it was a totally different attitude and a totally different person than the person [he] spoke to in the morning." When he was asked to explain, Joiner said, "I mean, screaming, aggressiveness, threatening." Joiner quoted Ted as saying:

> You don't know who you're fucking with . . . . [Y]ou don't know me and my family. I have a lot of cousins. My uncle's not built like that, but I am. I don't mind doing the time. I'll kill you and your wife. Ask your wife about me. She knows about me.

Joiner, who was in his garage, asked Naill to retrieve his "self-defense weapon" from the house, so that "if something did transpire, [he] would be able to defend [him]self and [his] family." Naill "unfortunately" brought back two guns. He told her to return one of the guns to the house. He then called 911.

---

[4] Heiser is Ted's cousin.

After Naill left the garage, Joiner heard her "screaming" and "yelling[.]" Joiner testified:

> So being that there was already a threat on our lives, I came out of the garage and I brandished the weapon. I was yelling that the police were on their way. I was yelling . . . for them to leave. They weren't welcome there.
>
> And immediately I see [Naill] and Ted Rill in a physical altercation, and then out of the corner of my eye I see another gentleman. Without knowing what's going on, I turn to him, and then before I know it Ted Rill has [Naill's gun] . . . and [is] running towards me, shoots me and starts hitting me.

Joiner said, "[w]e were in a scuffle when I fired . . . my weapon." Joiner fired two shots. When he was asked whether he intended to shoot Ted, he said, "I felt threatened for my life at some point[,] . . . [a]nd I had no choice but to defend myself at that point."

Joiner attributed the discrepancies between the statement he gave at the hospital and his trial testimony on the narcotics he was administered by paramedics and hospital staff. He said, "it sounds like I did my best to, to state what I know or what I thought I knew, and I understand that . . . it wasn't exact[.]"

Joiner insisted he never saw Naill put a gun to Ted's head. He said he knew she had a gun, but he "didn't recall any of her actions[.]"

## C. Jury Instructions

The court instructed the jury as to the elements of two defenses raised by Joiner, defense of others and self-defense:

> You have heard evidence that the Defendant acted in defense of Kristen Naill. Defense of others is a defense, and you are required to find the Defendant not guilty if all of the following four factors are present. One, that the Defendant actually believed that the person he was defending was in immediate and imminent danger of bodily harm; two, that the Defendant's

9

belief was reasonable; three, that the Defendant used no more force than was reasonably necessary in light of the threatened or actual force; and four, that the Defendant's purpose in using force was to aid the person he was defending.

\* \* \*

You have heard evidence that the Defendant acted in self-defense. Self-defense is a complete defense, and you are required to find the Defendant not guilty if all of the following four factors are present. One, the Defendant was not the aggressor; two, the Defendant actually believed that he was in immediate and imminent danger of bodily harm; three, the Defendant's belief was reasonable; and four, the Defendant used no more force than was reasonably necessary to defend himself in light of the threatened or actual harm.

The court further instructed the jury that one of the elements of self-defense requires that the defendant make a reasonable effort to retreat before using deadly force, but Joiner had no duty to retreat if he was "in his home or upon the curtilage of his home." In a supplemental instruction given in response to a note from the jury, the court defined "curtilage" as "the yard and any outbuildings of the defendant's home."

### D. State's Closing Argument

In closing argument, the State questioned Joiner's credibility, suggesting the video of the first encounter was inconsistent with Joiner's testimony that the interaction was tense. Instead, the prosecutor argued, the video supported Ted and Lester's testimony that the initial meeting was "cordial." The prosecutor also argued the video did not support Joiner's testimony that Ted was the aggressor, and the video footage negated any inference that Ted presented a threat justifying the use of deadly force:

> [W]hat you see on the video is not an aggressive person running to the garage or running to the house, running onto the property [saying] ["]Where are you? I'm going to kill you.["] [Ted is] milling about on the phone, and the phone records will show he is calling [Joiner's] number . . . , like ["]are you here?["] . . . [A]nd all of a sudden [Naill] comes up to him with a gun to

10

[Ted's] head[.] What threat does he pose? This is all on the video. You can see that yourself.

[Ted] was not a threat, and he certainly wasn't a threat that required the use of deadly force by Mr. Joiner pointing a gun to his head, going off his own property, many feet off his own property, to a retreating individual and putting a gun to his face.

They had already called 911. You have a person that you think is a threat. They come to your house. You point a gun at them from your own property and say ["]stay off my property. Get off my property. I've called the police.["] What is the need to go . . . off your property and create a deadly force encounter?

They said the police are on the way. Mr. Joiner knows that the police are close. What was [Ted] doing that required them to go beyond just, ["]stay where you are and stay off my property?["] What was [Ted] doing on that video that required Mr. Joiner to put the gun within feet of his head and Ms. Naill to put it at his head? Nothing.

As stated, Joiner was convicted of two counts of first-degree assault, two counts of use of a firearm in the commission of a crime of violence, and two counts of reckless endangerment.[5] This timely appeal followed. Additional facts will be included as necessary.

_____

[5] The victims of the reckless endangerment counts were Ted's child, who was in Ted's truck at the time of the shooting, and Joiner's child, who was in the backyard moments before.

11

**DISCUSSION**

### I. The Court Did Not Abuse its Discretion in Declining to Instruct the Jury on the Defense of Habitation.

#### A. Parties' Contentions

Joiner asserts the court erred in declining to instruct the jury on defense of habitation. Joiner claims the instructions given "failed to inform the jurors that they must acquit Joiner if they found that he reasonably believed he was about to be attacked on his property." The State maintains the defense of habitation instruction was not generated by the evidence as there was no evidence that Ted or Lester entered or attempted to enter Joiner's home. We agree with the State.

#### B. Standard of Review

The trial court is required to give a specific instruction to the jury when three conditions are met: "(1) it 'is a correct statement of the law;' (2) it 'is applicable under the facts of the case;' and (3) its contents were 'not fairly covered elsewhere in the jury instruction[s] actually given.'" *Jarvis v. State*, 487 Md. 548, 564 (2024) (quoting *Rainey v. State*, 480 Md 230, 255 (2022)). "[I]f any one part of the test is not met, we will affirm the trial court's denial of the request for instruction[.]" *Collins v. Nat'l R.R. Passenger Corp.*, 417 Md. 217, 230 (2010) (quoting *Fearnow v. Chesapeake & Potomac Tel. Co.*, 342 Md. 363, 385 (1996)).

With respect to the second prong of the test, "'[t]he threshold determination of whether the evidence is sufficient to generate the desired instruction is a question of law' and thus is reviewed de novo[.]" *Hollins v. State*, 489 Md. 296, 309 (2024) (quoting *Bazzle*

12

*v. State*, 426 Md. 541, 550 (2012)). "In determining whether there was 'some evidence' to support the instruction, we review the evidence in the light most favorable to the accused." *Id.* (citing *Dykes v. State*, 319 Md. 206, 221-22 (1990)).

The decision whether to give a particular jury instruction is reviewed for abuse of discretion. *Wright v. State*, 474 Md. 467, 482 (2021). The trial court's decision "will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *State v. Sayles*, 472 Md. 207, 230 (2021) (quoting *Appraicio v. State*, 431 Md. 42, 51 (2013)). "A trial court abuses its discretion if it commits an error of law in giving an instruction." *Wright*, 474 Md. at 482 (citing *Harris v. State*, 458 Md. 370, 406 (2018)).

## C. Analysis

A jury instruction is "applicable under the facts of the case" if "the evidence is sufficient to permit a jury to find its factual predicate." *Rainey*, 480 Md. at 255 (quoting *Bazzle*, 426 Md. at 550). In other words, the instruction must be given if the requesting party has produced "'some evidence' sufficient to raise the jury issue." *Jarvis*, 487 Md. at 564 (quoting *Arthur v. State*, 420 Md. 512, 525 (2011)). "[T]he 'some evidence' standard is a 'fairly low hurdle[,]' and 'calls for no more than what it says— "some," as that word is understood in common, everyday usage.'" *Hollins*, 489 Md. at 314 (quoting *Arthur*, 420 Md. at 526). "As long as the relied-upon evidence, if believed by a rational juror, supports the proponent's claim, the proponent has met the burden of showing that the requested jury instruction applies to the facts of the case." *Id.* at 312. To generate an instruction on a defense to a criminal charge, "[t]he defendant must meet this burden as to each element of

13

the defense[.]" *Jarvis*, 487 Md. at 564.

Maryland Criminal Pattern Jury Instruction 5:02, titled "Defense of Habitation – Deadly Force," reads as follows:

> You have heard evidence that the defendant acted in defense of (pronoun) home. Defense of one's home is a defense, and you are required to find the defendant not guilty if all of the following five factors are present:
>
> (1)     [name of person] entered [or attempted to enter] the defendant's home;
>
> (2)     the defendant believed that [name of person] intended to commit a crime that would involve an imminent threat of death or serious bodily harm;
>
> (3)     the defendant reasonably believed that [name of person] intended to commit such a crime;
>
> (4)     the defendant believed that the force that (pronoun) used against [name of person] was necessary to prevent imminent death or serious bodily harm; and
>
> (5)     the defendant reasonably believed that such force was necessary.
>
> In order to convict the defendant, the State must show that the defense of one's home does not apply in this case by proving, beyond a reasonable doubt, that at least one of the five factors previously stated was absent.

"The habitation defense applies when a defendant has used deadly force in response to a reasonable belief that the victim intended to commit a felony in the home or to inflict serious bodily harm or death on the inhabitants of the home." *Braboy v. State*, 130 Md. App. 220, 226 n.9 (2000). Defense of habitation is "essentially a corollary to the 'castle doctrine,' which allows a person to use deadly force without the need to retreat, in order to protect the person's home." *Id.* (citing *Crawford v. State*, 231 Md. 354, 360, 361–62 (1963)).

14

We conclude the defense of habitation instruction was not applicable to the facts of the case, as there is no evidence from which a jury could conclude Ted or Lester entered or attempted to enter Joiner's home. Accordingly, because Joiner failed to meet his burden of producing "some evidence" as to that element of the defense, the court did not err in determining the instruction was not applicable to the facts of the case and did not abuse its discretion in declining Joiner's request for the instruction.

Even if we were to agree with Joiner that the evidence generated a defense of habitation instruction, we would still affirm. As the Supreme Court of Maryland stated, "the distinction that is made between defense of the home and defense of the person is merely that in the former there is no duty to retreat." *DeVaughn v. State*, 232 Md. 447, 454 (1963) (citing *Crawford*, 231 Md. at 361–62). In *Braboy v. State*, this Court held the trial court's instruction on self-defense also explained that a defendant does not have a duty to retreat when the defendant is in their home and therefore, "adequately covered" the defense of habitation instruction. 130 Md. App. at 229–30. Here, the court's instruction on the defense of self-defense was even broader, in that it advised the jury Joiner was not required to retreat if he was "in his home or upon the curtilage of his home." Consequently, even if the defense of habitation instruction was applicable to the facts of the case, the court was not required to give it because the contents of that instruction were "fairly covered elsewhere" in the court's instructions. *Jarvis*, 487 Md. at 564.

II. **The Court Did Not Err in Allowing Corporal Buck to Testify That Joiner was the Aggressor in the Altercation.**

One of the issues the jury had to resolve was whether Joiner acted in self-defense or

15

whether he was the initial aggressor. During the cross-examination of Corporal Buck, defense counsel elicited evidence that, in the application for a warrant to search Ted's truck, Corporal Buck wrote: "[i]t is reasonable to believe that in the chaos of the scene, one or more subjects on scene could have manipulated the scene, especially since [Ted and Lester] are considered the initial aggressors in this case." Corporal Buck explained that, when he prepared the application for the warrant, he did not yet have the surveillance video, so he "had to base it off of . . . the statements that [he] had" at that time, which were those of Joiner, Naill, and Lester.

On redirect, Corporal Buck testified, over objection, that, at the conclusion of his investigation, his assessment of the initial aggressor changed, and he deemed Joiner to be the aggressor:

> [PROSECUTOR]: At the end of your investigation, what was your assessment of the initial aggressor that you presented to the State's Attorney's Office?
>
> [DEFENSE COUNSEL]: Objection, assessment of the - -
>
> THE COURT: Repeat the question.
>
> [PROSECUTOR]: At the end of your investigation, what was your new assessment of the initial aggressor status?
>
> THE COURT: Overruled.
>
> CORPORAL BUCK: So my take on it was that when Ted Rill arrived on the scene, Ms. Naill and Mr. Joiner came out with guns drawn and left their property to confront Ted Rill, at which time Ms. Naill put the firearm to his head.
>
> [PROSECUTOR]: So I asked you, but who would - - then who would you deem to be the initial aggressor?

16

CORPORAL BUCK: Mr. Joiner.

## A. Parties' Contentions

Joiner maintains the court erred in allowing Corporal Buck to testify on redirect that Joiner was the aggressor. Joiner argues the testimony invaded the province of the jury and prejudiced his right to a fair trial.[6]

The State asserts Corporal Buck's testimony was properly admitted as lay opinion testimony. Alternatively, the State contends that, even if the evidence was inadmissible, defense counsel "opened the door" to the testimony during cross-examination.

## B. Standard of Review

The trial court has "wide" discretion to control the scope of redirect examination. *Daniel v. State*, 132 Md. App. 576, 583 (2000). The court's discretion is "particularly wide 'where the inquiry is directed toward developing facts made relevant during cross-examination or explaining away discrediting facts.'" *Id.* (quoting *Bailey v. State*, 16 Md. App. 83, 110–111 (1972)). "[A] party is generally entitled to have his witness explain or amplify testimony that he has given on cross-examination and to explain any apparent inconsistencies." *Id.* (citing *Feeney v. Dolan*, 35 Md. App. 538 (1977)).

---

[6] Joiner also claims the court erred in allowing Corporal Buck to testify that (1) he had no reason to believe that Ted lied in his statement regarding the incident, and (2) Joiner's statement was not consistent with the surveillance video. The State asserts that, because Joiner did not object to this testimony, he waived his right to appellate review. We agree with the State that the issue was waived. "It is well established that a party opposing the admission of evidence 'shall' object at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." *Ware v. State*, 170 Md. App. 1, 19 (2006) (some internal quotation marks omitted) (quoting *State v. Jones*, 138 Md. App. 178, 218 (2004)).

17

The appellate court will "not disturb a trial court's evidentiary ruling unless the evidence is plainly inadmissible under a specific rule or principle of law or there is a clear showing of an abuse of discretion." *Bey v. State*, 228 Md. App. 521, 535 (2016) (quoting *Moreland v. State*, 207 Md. App. 563, 568–69 (2012)), *aff'd* 452 Md. 255 (2017). An abuse of discretion occurs when the trial court's decision is "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Moreland*, 207 Md. App. at 569 (citations omitted).

**C. Analysis**

We need not address Joiner's contention that Corporal Buck's testimony on redirect invaded the province of the jury because we agree with the State that, even if Corporal Buck's assessment of the aggressor was not initially admissible, Joiner's cross-examination of Corporal Buck "opened the door" for the State's line of questioning on redirect.

"The 'opened door' doctrine is based on principles of fairness and permits a party to introduce evidence that otherwise might not be admissible in order to respond to certain evidence put forth by opposing counsel." *Mitchell v. State*, 408 Md. 368, 388 (2009) (citing *Conyers v. State*, 345 Md. 525, 545 (1997)). The doctrine is applicable where, as in this case, the cross-examination of a witness has "'expanded the scope' of [the] witness's testimony" on direct. *Miller v. State*, 421 Md. 609, 629 (2011) (quoting *Trimble v. State*, 300 Md. 387, 402–03 (1984)).

In *Trimble v. State*, the defendant, who was on trial for rape and murder, asserted a defense of insanity. 300 Md. at 393. A witness for the State, Dr. Blumberg, testified that,

18

although the defendant suffered from antisocial personality disorder and mixed substance abuse disorder, those disorders did not render him unable to appreciate the criminality of his conduct or to conform his conduct to the law. *Id.* at 395. Dr. Blumberg further testified the defendant may have been faking his symptoms. *Id.*

On cross-examination, Dr. Blumberg acknowledged that, upon the defendant's admission to a psychiatric hospital, he was prescribed Thorazine, an antipsychotic drug and a major tranquilizer. *Id.* at 399. On redirect, Dr. Blumberg testified, over objection, the staff psychologist who prescribed Thorazine "seem[ed] a lot more likely than most of the other psychiatrists to prescribe a medication primarily to sedate" a "very agitated" patient who exhibits "bizarre behavior," rather than for any necessary "psychotic benefit of the drug[.]" *Id.* at 401.

On appeal, the defendant argued Dr. Blumberg's testimony on redirect was grounds for reversal because it violated the best evidence rule and the rule against hearsay. *Id.* The Court held that, because the defendant went beyond the scope of Dr. Blumberg's direct examination (which had been limited to his conclusions based on his own examination of the defendant) and asked about the actions of the staff psychologist in prescribing Thorazine, the trial court did not err in allowing the State to rebut the significance of that evidence. *Id.* at 402-03. The Court reasoned:

> Trimble objects to the State's inquiry on redirect because he claims it is tantamount to having Dr. Blumberg testify as to Dr. Freinek's opinion as to whether Trimble was psychotic. As we see it, Trimble's objection seeks to cloud the issue. What Trimble conveniently overlooks is that he opened the door to such testimony by eliciting from Dr. Blumberg the inference that Dr. Freinek had prescribed Thorazine for Trimble because Trimble was psychotic . . . . Because the State established that Dr. Blumberg was familiar

19

with Dr. Freinek's prescription policies, it had a sound basis for explaining the inference to be drawn from the fact of Dr. Freinek's prescribing Thorazine for Trimble. Defense counsel, having created the issue, cannot now be heard to complain that the State sought to rebut its significance. We find no error on this point.

*Id.*

Similarly, in *Molina v. State*, 244 Md. App. 67 (2019), this Court held the defendant's complaint that the State "elicited the same brand of opinion testimony" from a lay witness that the defendant had elicited on cross-examination and re-cross was without merit. *Id.* at 145. We explained: "[a]n appellant may not assert, as a ground for reversal, the inadmissibility of evidence when she elicited substantially the same evidence herself." *Id.* (citing *Miller*, 421 Md. at 629).

Here, it was Joiner who first elicited Corporal Buck's opinion of the identity of the aggressor, at least as of the early stages of the investigation. In so doing, he opened the door for the State, on redirect, to rebut the significance of that evidence by asking Corporal Buck whether his opinion changed during the course of the investigation. We perceive no abuse of discretion by the court in permitting the State to do so.

### III. The Court Did Not Err in Sustaining the State's Objection to Evidence Regarding Ted's Criminal History.

In opening statements, defense counsel told the jury that, after Joiner called 911 and told Naill to bring him his gun, he accessed the Maryland Judiciary Case Search website on his phone and searched Ted Rill's criminal history. According to defense counsel, Joiner learned Ted had "committed a crime with a firearm."

On direct examination, Ted denied that he was convicted of a crime that involved

20

the use of a firearm. But he admitted he was convicted of illegal possession of a firearm in 2016. He explained that, as a result of a prior finding of juvenile delinquency, he was prohibited from possessing a firearm until he was 30 years old. When he was 28 or 29, he and his brother-in-law were shooting at clay pigeons with his brother-in-law's shotgun. The police responded to the area after receiving a complaint of gunshots in the area. As a result, Ted was charged with, and convicted of, illegal possession of a firearm.

On cross-examination, defense counsel attempted to ask Ted about an alleged assault which, according to defense counsel's proffer at the ensuing bench conference, arose from the same set of facts:

> [DEFENSE COUNSEL]: Now you had a prior problem . . . where you pointed a loaded shotgun - -
>
> [PROSECUTOR]: Objection.

The following conversation took place at the bench:

> THE COURT: Is this a conviction? Was the Defendant [sic] convicted for pointing a firearm at somebody?
>
> [DEFENSE COUNSEL]: He was convicted of a possession of a firearm after being disqualified.
>
> THE COURT: Right. He testified to that.
>
> [PROSECUTOR]: Which he has already testified to.
>
> [DEFENSE COUNSEL]: And there was some other [charge] with it. It could be assault . . . .

Defense counsel argued evidence of a related assault charge was relevant because "[it] is a totally different story than shooting at clay [pigeons.]" The colloquy continued:

> THE COURT: Let's assume that [Ted] . . . was accused of pointing a gun at

21

somebody. What is the relevance of that?

[DEFENSE COUNSEL]: Well, he pointed a gun in this case.

THE COURT: Well, that sounds like propensity evidence, doesn't it?

[DEFENSE COUNSEL]: Well, he is telling a story, which is a totally different story that what I have seen in the records.

[PROSECUTOR]: He is introducing irrelevant evidence only to impeach with it, which is not permitted.

The court sustained the objection.

### A. Parties' Contentions

Joiner contends the court abused its discretion in precluding him from cross-examining Ted regarding the incident that led to his prior conviction for illegal possession of a firearm. He argues the ruling prevented him from attempting to impeach Ted's credibility by questioning him about information gleaned from police reports that, according to Joiner, "established a completely different version of the prior conviction" than what the jury heard. Joiner claims whether Ted "testif[ied] falsely about the underlying facts of a prior conviction" was directly relevant to his credibility, and therefore, he "should have been allowed to use the facts from the police report of the prior conviction to cross-examine Ted as to his credibility."[7]

---

[7] Joiner also asserts the State "opened the door" to otherwise inadmissible evidence by eliciting "favorable details" about the prior conviction that "suggested to the jury that Ted only had nonviolent prior involvement with the criminal justice system[.]" We agree with the State's argument that, because Joiner never raised this theory of admissibility before the trial court, it was not preserved for appellate review. Md. Rule 8-131(a) ("Ordinarily, an appellate court will not decide any [non-jurisdictional] issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]"); *see also Robson v. State*, 257 Md. App. 421, 461 (one "purpose of the preservation requirement

The State asserts the court properly precluded Joiner from cross-examining Ted regarding the underlying facts of his previous conviction because it was irrelevant.

## B. Standard of Review

"Managing the scope of cross-examination is a matter that falls within the sound discretion of the trial court." *Simmons v. State*, 392 Md. 279, 296 (2006) (citing *Marshall v. State*, 346 Md. 186, 193 (1997)). An appellate court will overturn a ruling of the trial court limiting cross-examination designed to impeach a witness "only if the court 'exercise[d] discretion in an arbitrary or capricious manner or . . . act[ed] beyond the letter or reason of the law.'" *Thomas v. State*, 422 Md. 67, 73 (2011) (quoting *King v. State*, 407 Md. 682, 696 (2009)). A trial court does not abuse its discretion "when it excludes cross-examination that is irrelevant." *Simmons*, 392 Md. at 296 (citing Md. Rule 5-402).

## C. Analysis

"The right of a defendant in a criminal case to cross-examine a witness for the prosecution is grounded in the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights." *Manchame-Guerra v. State*, 457 Md. 300, 309 (2018) (citations omitted). "[T]he defendant's right to cross-examine witnesses includes the right to impeach credibility[.]" *Pantazes v. State*, 376 Md. 661, 680 (2003). "To comply with the Confrontation Clause, a trial court must allow a defendant a 'threshold level of inquiry' that 'expose[s] to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating

---

is to protect the trial judge from being charged with error without having been alerted to the risk by counsel."), *cert. denied*, 483 Md. 520 (2023).

to the reliability of the witnesses.'" *Peterson v. State*, 444 Md. 105, 122 (2015) (quoting *Martinez v. State*, 416 Md. 418, 428 (2010)).

"The right to cross-examine is not without limits, however, and 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Smallwood v. State,* 320 Md. 300, 307 (1990) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). "As long as the trial court provides a defendant in a criminal case the 'threshold of inquiry' required by the Confrontation Clause, the court's limitation on cross-examination will be reversed only for an abuse of discretion." *Montague v. State*, 244 Md. App. 24, 65 (2019) (citing *Peterson*, 444 Md. at 123–24).

Impeaching a witness with his or her prior conduct is permitted under Maryland Rule 5-608(b): allowing "any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness." The Rule "represents an exception to the general prohibition, embodied in Rule 5-404,[8] against using evidence of character to show propensity." *Pantazes*, 376 Md. at 682 (footnote and citation omitted).

---

[8] Rule 5-404(b) provides that evidence of "other crimes, wrongs, or acts" may be admissible for purposes other than propensity evidence, such as motive, opportunity, intent, etc. That rule, however, applies only to a defendant in a criminal or civil proceeding. *See Lewin Realty III, Inc. v. Brooks,* 138 Md. App. 244, 266 (2001), *aff'd*, 378 Md. 70 (2003), *abrogated on other grounds by Ruffin Hotel Corp. of Md. v. Gasper,* 418 Md. 594 (2011).

"[N]ot all acts of misconduct are 'prior bad acts that are relevant to assessing [the witness's] credibility[.]'" *Ellsworth v. Balt. Police Dep't*, 438 Md. 69, 88 (2014) (citing *Robinson v. State*, 298 Md. 193, 197 (1983)). Prior bad acts are only relevant if they "logically relate to a witness's character for untruthfulness." *Id.*

Furthermore, "when impeachment is the aim, the relevant inquiry is not whether the witness has been accused of misconduct by some other person, but whether the witness actually committed the prior bad act." *Fields v. State*, 432 Md. 650, 674 (2013) (quoting *State v. Cox*, 298 Md. 173, 181 (1983)). To overcome an objection, the proponent must demonstrate a "reasonable factual basis" for asserting the conduct occurred. Md. Rule 5-608(b). "[M]ere accusations of crime or misconduct may not be used to impeach[.]" *Fields*, 432 Md. at 674 (quoting *Cox*, 298 Md. at 179). The rationale is that "accusations of misconduct are still clothed with the presumption of innocence[,] and receiving mere accusations for [impeachment] purpose[s] would be tantamount to accepting someone else's assertion of the witness' guilt and pure hearsay." *Cox*, 298 Md. at 180. And, as the Supreme Court of Maryland stated, "[a] hearsay accusation of guilt has little logical relevance to the witness' credibility." *Id.* at 181.

Here, Joiner sought to cross-examine Ted about an unrelated police report containing accusations that Ted pointed a gun at someone. The court did not abuse its discretion in sustaining the State's objection as the alleged assault was both (1) a "hearsay accusation of guilt" and (2) not logically related to Ted's character for untruthfulness. *Id.* at 181.

25

IV. **The Evidence was Sufficient to Sustain the Convictions for First-Degree Assault.**

A. **Parties' Contentions**

Joiner asserts his convictions for first-degree assault (and the related convictions for use of a firearm in the commission of a crime of violence) should be reversed because the evidence was legally insufficient. Joiner does not argue the State failed to prove any of the elements of first-degree assault. Instead, he contends the State failed to prove he did not act in self-defense or defense of others.

The State maintains that, in evaluating the sufficiency of the evidence to sustain the convictions for first-degree assault, we need not consider whether the State sufficiently negated Joiner's claim that he acted in self-defense or in defense of Naill. The State asserts "the jury could simply disbelieve the evidence tending to show self-defense or defense of others."

B. **Standard of Review**

"The standard for appellate review of evidentiary sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith*, 374 Md. 527, 533 (2003) (citations omitted). We make our determination without re-weighing the evidence or unduly intruding upon the factfinder's "finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses*." McDonald v. State*, 347 Md. 452, 474 (1997) (citing *State v. Albrecht*, 336 Md. 475, 478 (1994)). We recognize "the finder of fact has the 'ability to

26

choose among differing inferences that might possibly be made from a factual situation[.]'" *Smith v. State*, 415 Md. 174, 183 (2010) (quoting *State v. Smith*, 374 Md. at 534). As such, we "defer to any possible reasonable inferences the [trier of fact] could have drawn from the admitted evidence[.]" *State v. Mayers*, 417 Md. 449, 466 (2010) (citing *State v. Smith*, 374 Md. at 557).

## C. Analysis

To be entitled to an instruction with respect to self-defense or defense of others, "the defendant has the 'burden of initially producing "some evidence" on the issue of mitigation or self-defense . . . sufficient to give rise to a jury issue.'" *Wilson v. State*, 422 Md. 533, 541 (2011) (quoting *Simmons v. State*, 313 Md. 33, 39–40 (1988)).

> The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden.

*Dykes v. State*, 319 Md. 206, 217 (1990)). Once the issue has been generated by the evidence, "the baton is passed to the State[,] [which] must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not [act] in self-defense." *Id.*

To defeat a motion for judgment of acquittal where a claim of self-defense or defense of others has been raised, it is not necessary for the State to affirmatively negate any evidence tending to support such a claim. *Hennessy v. State*, 37 Md. App. 559, 561–62, *cert. denied*, 281 Md. 738 (1977). It is up to the jury to decide whether evidence that the defendant acted in self-defense or in defense of others is worthy of belief. *Id.*; *see also*

27

*Johnson v. State*, 227 Md. 159, 163 (1961) ("[E]xculpatory statements by an accused are not binding upon, but may be disbelieved by, the trier of facts[.]").

In *Hennessy v. State*, we rejected an argument similar to the one Joiner now raises, stating:

> Appellant concedes by silence that there was sufficient evidence to sustain a manslaughter verdict, but argues that because the State did not affirmatively negate [his] self-defense testimony, he was entitled to what amounts to a judicially declared holding of self-defense as a matter of law. That is of course, absurd. The factfinder may simply choose not to believe the facts as described in that, or any other, regard, and the very fact that a large knife was used, causing the death of an unarmed man, raises in itself the issue of excessive force even if appellant's account had been believed.

*Id*. at 561–62 (internal citations omitted). Similarly, in *Rajnic v. State*, 106 Md. App. 286, 293 (1995), we held sufficient evidence existed from which a jury could reject appellant's claim of self-defense, despite the undisputed testimony that the victims were larger than appellant, intoxicated, threatened to beat appellant, and charged into his bedroom.

Here, although Joiner's testimony may have generated the issue of self-defense and defense of others for the jury's consideration, that evidence did not establish he was entitled to judgment in his favor as a matter of law. The jury was free to disbelieve Joiner's testimony that Ted threatened to kill him and his family and Ted initiated the confrontation. Alternatively, the jury could have reasonably concluded the degree of force used by Joiner was unreasonable. The court did not err in denying Joiner's motion for judgment of acquittal.

**THE JUDGMENTS OF THE CIRCUIT COURT FOR CARROLL COUNTY ARE AFFIRMED. APPELLANT TO PAY THE COSTS.**